874 F.2d 912
 57 USLW 2724, RICO Bus.Disp.Guide 7217,
10 Employee Benefits Ca 2673
 Harry J. DIDUCK, individually and as a participant in the
Local 94 Insurance Trust Fund and the Local 95 Pension Fund,
and on behalf of all other persons who are, will be, or have
at any time since January 1980 been participants in the
Funds, similarly situated, Plaintiffs-Appellants,
v.
KASZYCKI & SONS CONTRACTORS, INC.; William Kaszycki; John
Senyshyn; Trump-Equitable Fifth Avenue Company; Donald J.
Trump; Donald J. Trump d/b/a the Trump Organization; the
Equitable Life Assurance Society of the United States; and
the Trustees of the House Wreckers Union Local 95 Insurance
Trust Fund and of the House Wreckers Union Local 95 Pension
Fund, Defendants-Appellees.
 No. 729, Docket 88-7882.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 30, 1989.
Decided May 10, 1989.
 
 1
 Wendy E. Sloan, Burton H. Hall, New York City (Hall & Sloan, New York City, on the brief), for plaintiffs-appellees Harry J. Diduck.
 
 
 2
 Robert Wang, New York City (Hendler, Murray & Mait, New York City, on the brief), for defendant-appellee John Senyshyn.
 
 
 3
 Arthur N. Lambert, Kenneth L. Aron, New York City (Lambert & Weiss, New York City, on the brief), for defendants-appellees Trustees.
 
 
 4
 Milton S. Gould, Fran M. Jacobs, New York City (Shea & Gould, New York City, on the brief), for defendants-appellees Trump.
 
 
 5
 Before VAN GRAAFEILAND and CARDAMONE, Circuit Judges, and SWEET, District Judge.*
 
 SWEET, District Judge:
 
 6
 Plaintiff Harry J. Diduck ("Diduck") has appealed from summary judgment dismissing his complaint against several parties that he alleges are liable for contributions an insolvent demolition contractor failed to make to pension and insurance funds of which Diduck is a beneficiary. In dismissing Diduck's complaint, the Honorable Charles E. Stewart held that Diduck lacked standing to sue derivatively on behalf of the pension and insurance funds because the trustees of those funds had not breached a fiduciary duty, that Diduck could not maintain an action under the Racketeer Influenced and Corrupt Organizations law (RICO) because no criminal enterprise existed, and that the statute of limitations under the Employee Retirement Income Security Act (ERISA) barred his claims. Having dismissed the federal claims, Judge Stewart also held that he lacked jurisdiction to consider the pendent state claims. For the reasons set forth below, we reverse and remand.
 
 The Facts
 
 7
 In 1979, the Trump Organization, Inc. (the "Trump Organization") and the Equitable Life Assurance Company ("Equitable") created a joint venture--called the Trump-Equitable Fifth Avenue Company ("Trump-Equitable")--(collectively, with Donald J. Trump ("Trump"), the "Trump defendants") to demolish the old Bonwit Teller building on Fifth Avenue and construct the building now known as Trump Tower (the "Trump Tower Project"). To perform the demolition, Trump-Equitable hired William Kaszycki ("Kaszycki") and his company, Kaszycki and Sons Contractors, Inc. (the "Kaszycki Corporation"), (collectively, the "Kaszycki defendants") pursuant to a written agreement signed January 30, 1980 (the "demolition agreement"). The demolition agreement obligated Trump-Equitable to pay the Kaszycki Corporation $775,000 and made the Kaszycki Corporation responsible for providing labor, equipment, and supplies.
 
 
 8
 The Trump Tower Project was the Kaszycki Corporation's first and only complete building demolition. Previously, Kaszycki--through a company called "Interstate Window Cleaning"--had engaged primarily in window cleaning, although he had performed some interior demolition work. Kaszycki testified at his deposition that the only reason he formed "Kaszycki and Sons Contractors, Inc." was because "It didn't sound good for a window cleaning company to do demolition work."
 
 
 9
 To obtain workers for the Trump Tower Project, Kaszycki entered into a collective bargaining agreement on behalf of the Kaszycki Corporation with Housing Wreckers' Union Local 95 ("the Union") for the period from January 1, 1980 through June 30, 1981. Kaszycki's signature on the collective bargaining agreement is undated. None of the Trump defendants signed this agreement.
 
 
 10
 The Kaszycki Corporation began the Trump Tower Project in January 1980 and continued the work until August 1980. During this period, the Kaszycki Corporation employed both Union and non-union workers. The non-union workers consisted primarily of some 200 Polish aliens--sometimes referred to as the "Polish Brigade"--whom the company paid less than Union workers. The Polish workers performed much of the demolition work.
 
 
 11
 The collective bargaining agreement obligated the Kaszycki Corporation to contribute eight percent of total wages to the Union's Insurance Trust Funds and ten percent to its Pension Funds (the "Funds") on behalf of both Union and non-union workers. To calculate the contributions to the Funds, the collective bargaining agreement provided for the Union's shop steward and the Kaszycki Corporation to file weekly reports listing the workers on the job, the number of hours they worked, and their wages. Despite this requirement, the shop steward and employer reports for the Trump Tower Project listed the Union workers, but not the Polish workers.
 
 
 12
 Defendant John Senyshyn ("Senyshyn"), the Union's president and a Trustee of the Funds, served as the Union's shop steward on the Trump Tower Project for three weeks, beginning March 25, 1980. He filed his first shop steward report for the week ending March 26, 1980 and thereafter filed two other shop steward reports. After that, another Union member, John Osijuk ("Osijuk"), became shop steward and filed the weekly shop steward reports. Although Senyshyn ceased acting as shop steward in mid-April, the weekly shop steward and payroll reports listed Senyshyn as receiving wages for working at the Trump Tower Project until at least August 12, 1980.
 
 
 13
 During the Trump Tower Project, the Kaszycki Corporation became financially insolvent and failed to pay the workers' wages and to contribute to the Funds. In early June 1980, the Union notified Trump-Equitable of the Kaszycki Corporation's failure to pay wages and Fund contributions.
 
 
 14
 In response, Thomas Macari ("Macari"), a vice president with the Trump Organization, sent the Kaszycki Corporation a letter on June 6, 1980 notifying it of the Union's concerns and stating:
 
 
 15
 I urge you to take immediate action to correct this problem. Any delay in this job could mean hundreds of thousands of dollars in the cost of this building for which we will hold you responsible.
 
 
 16
 Despite Macari's letter, the Kaszycki Corporation's failure to contribute to the Funds persisted.
 
 
 17
 When the Funds' Trustees (the "Trustees") realized that the Kaszycki Corporation was failing to pay its contributions to the Funds, they voted in their June 16, 1980 meeting to impose work stoppages. To prevent work stoppages and the delays they would have caused, Trump-Equitable made a number of payments to the Funds during June and July. Along with the checks, Trump-Equitable sent the Funds receipts stating that it was making the payments "On behalf of Kaszycki & Sons Contractors, Inc." The Funds treated the checks as payments from the Kaszycki Corporation--not from Trump-Equitable--in its records. Macari informed the Kaszycki Corporation about these payments and advised the company that Trump-Equitable would hold it responsible for them.
 
 
 18
 Because the employer and shop steward reports omitted the Polish workers' wages, the Trustees threatened work stoppages to obtain--and Trump-Equitable paid--Fund contributions only on behalf of the Union members.
 
 
 19
 At his deposition, Kaszycki testified that, about midway through the Trump Tower Project:
 
 
 20
 I lost the control of paying. Trump Organization, they pay to everybody. They gave me no money and they were making the payroll.
 
 
 21
 This involved paying for supplies and equipment, as well as for labor. Some of the Polish workers testified that Macari gave them job instructions. The record also contains evidence that Macari fired some of the Kaszycki Corporation's workers in late June 1980.
 
 
 22
 The demolition agreement obligated Trump-Equitable to make progress payments periodically to the Kaszycki Corporation. When the Kaszycki Corporation's financial problems became apparent, Trump-Equitable opened a joint checking account with the company and deposited the progress payments into that account, allegedly to prevent the company from diverting the progress payments from the Trump Tower Project to other purposes. Checks could be drawn on the account only with signatures from representatives of both the Kaszycki Corporation and Trump-Equitable. Kaszycki testified that Macari would present a check to him each week for his signature. The check then was cashed and used to pay the costs associated with the Trump Tower Project, including wages for Union and non-union workers and fund contributions for Union workers.
 
 
 23
 By the time the Trump Tower Project was complete, Trump-Equitable had paid $425,740 in expenses that the Kaszycki Corporation should have paid, in addition to the $742,000 it paid directly to the Kaszycki Corporation under the demolition agreement. Trump-Equitable never sued the Kaszycki Corporation to recover the money it had contributed to the Funds. At his deposition, Trump stated that such a lawsuit "would not have been fruitful."
 
 
 24
 As of December 8, 1980, the delinquencies to the Funds for the Union workers on the Trump Tower Project were satisfied. However, neither the Kaszycki Corporation nor Trump-Equitable contributed to the Funds on behalf of the Polish workers.
 
 
 25
 Diduck, the plaintiff in this action, is a member of the Union. Although he did not work on the Trump Tower Project, he had some suspicions about what was occurring there. In June 1980, Diduck ran unsuccessfully for Union office. In his campaign literature, he stated that the Trump Tower Project was "even worse than a scab job" and that Union labor was employed by day and "over thirty non-union men [were] working the night shift." He also says in this literature that "John Senyshyn is the Shop Steward at the job, which is located on 56th Street." In a June 16, 1980 letter apparently addressed to Mike Novak ("Novak"), the Union's business manager, Diduck wrote: "and just remember, you had shop stewards on jobs, who did not list their non-union men to the Pension and Welfare Funds, in all their reports, which are supposed to be weekly." At his deposition, Diduck admitted that the Trump Tower Project was one of the jobs to which this letter was referring.
 
 
 26
 Also in June 1980, Diduck helped one of the demolition workers employed by the Kaszycki Corporation file a complaint with the Labor Department. In response to this complaint, the Labor Department investigated and subsequently sued Kaszycki and his company under the minimum wage laws to collect wages due the Polish workers. See Donovan v. Kaszycki & Sons Contractors, Inc., 599 F.Supp. 860 (S.D.N.Y.1984). In that action, Judge Sprizzo ordered the Kaszycki defendants to pay a $570,000 judgment. When the Labor Department was unable to enforce the judgment, it instituted contempt proceedings. Judge Sprizzo entered an order permitting the Kaszycki defendants to pay the judgment in monthly installments of $3,000 over the next fifteen years.
 
 Prior Proceedings
 
 27
 On August 25, 1983, Diduck sued the Kaszycki defendants and Senyshyn to recover an estimated $600,000 owed to the Funds for the Polish workers. The complaint contained three claims and did not purport to be a derivative or class action.
 
 
 28
 On June 27, 1984, Diduck filed a motion to amend his complaint, which was granted on August 9, 1984. The amended complaint added the Trump defendants and, as nominal defendants, the Trustees. It also sought relief derivatively and as a class action.
 
 
 29
 The amended complaint included seven claims. The first charged the Kaszycki Corporation with failing to contribute to the Funds in violation of ERISA, 29 U.S.C. Sec. 1145. The second charged the Trump defendants with the same violation, alleging that Trump-Equitable had taken control of the Kaszycki Corporation and assumed its obligations under the collective bargaining agreement. The third charged the Kaszycki defendants, the Trump defendants, and Senyshyn with fraud for making false statements and concealing facts in documents required under ERISA, 29 U.S.C. Sec. 1031; 18 U.S.C. Sec. 1027. The fourth alleged that the Kaszycki defendants, the Trump defendants, and Senyshyn had committed fraud actionable under RICO, 18 U.S.C. Sec. 1961(1)(B). The fifth sought recovery from the Trump defendants for unjust enrichment actionable under New York state common law. The sixth alleged that Senyshyn breached his fiduciary duty under ERISA, 29 U.S.C. Sec. 1104, and engaged in transactions prohibited under ERISA, 29 U.S.C. Sec. 1106, by defrauding the Funds and by concealing the Kaszycki Corporation's and Trump-Equitable's failure to contribute to the Funds. The seventh alleged that Diduck had met the requirements under Rule 23.1, Fed.R.Civ.P., for bringing a derivative action.
 
 
 30
 In a decision dated July 18, 1988, Judge Stewart granted the Trump defendants' and Senyshyn's motions for summary judgment dismissing the claims against them and entered a default judgment against the Kaszycki defendants. Diduck moved for reargument and the Trustees moved for summary judgment. Judge Stewart denied Diduck's motion and granted the Trustees' motion in a memorandum decision dated August 30, 1988. Diduck has appealed from Judge Stewart's order dismissing his claims against the Trump defendants and Senyshyn.
 
 Issues on Appeal
 
 31
 1. Derivative Action Against the Trump Defendants
 
 
 32
 Diduck brought a derivative claim against the Trump defendants under ERISA, 29 U.S.C. Sec. 1145, to recover the delinquent contributions, alleging that the Trump defendants assumed the Kaszycki Corporation's obligation to contribute to the Funds under the collective bargaining agreement. Judge Stewart dismissed this claim, holding that Diduck lacked standing to sue derivatively on behalf of the Funds because the Trustees had breached no fiduciary duty. For the reasons set forth below, this dismissal is reversed.
 
 
 33
 A participant in a fund governed by ERISA can sue derivatively on behalf of the fund "only if the plaintiff first establishes that the trustees breached their fiduciary duty." Alfarone v. Bernie Wolff Constr. Corp., 788 F.2d 76, 80 (2d Cir.), cert. denied, 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986); see also McMahon v. McDowell, 794 F.2d 100, 108-11 (3d Cir.), cert. denied, 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986); Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 336-38 (3d Cir.1984). Under ERISA, trustees have a fiduciary duty to "act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries." Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447, reh'g denied, 473 U.S. 926, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985).
 
 
 34
 In performing this duty, trustees have a range of options--including suing the delinquent employer, randomly auditing the employer's records, threatening work stoppages, picketing the employer, or similar actions--depending upon the circumstances. There is no duty to take any particular course of action if another approach seems preferable. See Alfarone, 788 F.2d at 80; McMahon, 794 F.2d at 110. Rather, the trustees' duty is to act with "care, skill, prudence, and diligence," 29 U.S.C. Sec. 1104(a)(1)(B), in attempting to recover delinquent contributions or in declining to take a particular course of action to recover those contributions.
 
 
 35
 Here, the Trustees acted prudently when they declined to sue the Kaszycki defendants, recognizing that they were insolvent and could not satisfy a judgment. However, the Trustees breached their fiduciary duty by limiting their threatened work stoppages to collecting delinquent contributions for Union workers and by failing even to investigate a possible lawsuit against the Trump defendants to recover the delinquent contributions for the non-union workers.
 
 
 36
 Judge Stewart correctly concluded that the Trustees did not breach their fiduciary duty by refraining from suing the Kaszycki defendants because they were insolvent and would be unable to pay a judgment. The evidence supports this decision. During the Trump Tower Project, the Kaszycki defendants failed to contribute to the funds, despite threats of a suit by Trump-Equitable and work stoppages by the Union. Later, the Labor Department obtained a judgment against the Kaszycki defendants, but was unable to collect it and had to institute contempt proceedings. As Judge Stewart stated: "ERISA contains no requirement that the Trustees expend Fund assets to bring a lawsuit against an insolvent employer."
 
 
 37
 Although the Trustees acted prudently in opting for work stoppages instead of a lawsuit against the Kaszycki defendants, they breached their fiduciary duty by directing their threatened work stoppages only at collecting Fund contributions for the Union workers at the Trump Tower Project. The Union threatened work stoppages on at least four occasions during June and July of 1980, with considerable success. Each time, Trump-Equitable advanced the money the Kaszycki Corporation owed the Funds for Union members working on the Trump Tower Project. Ultimately, Trump-Equitable paid all of the contributions the Kaszycki defendants owed the Funds for the Union members, but it paid none of the contributions the company owed the Funds for the Polish workers.
 
 
 38
 The Trustees failed to collect delinquent contributions for non-union workers on the Trump Tower Project because they relied upon weekly employer and shop steward reports that omitted the Polish workers. The evidence indicates that the Trustees knew--or, with reasonable investigation, could have discovered--that these reports were inaccurate.
 
 
 39
 During an interview he gave to a Labor Department investigator on November 14, 1980 in connection with the Donovan action, Joseph Dektarovich (a.k.a. Dee) ("Dee"), the pension Fund's administrator, stated that the Kaszycki Corporation's hiring of the Polish workers was "common knowledge in the demolition field." Senyshyn, a Trustee, served as union shop steward for three weeks in March and April and worked on the Trump Tower Project until August 1980. The weekly payroll reports themselves offered some evidence that the Kaszycki Corporation was not reporting the Polish Brigade--Dee stated during his Labor Department interview that, had the reports been accurate, they would have included a fifteen percent pay differential to reflect the fact that some of the Polish workers worked at night. In June 1980, Diduck stated in his campaign literature that non-union workers were working at the Trump Tower Project. Diduck distributed this literature to the Union's membership, including the three Union-appointed Trustees of the Funds. Also in June 1980, Diduck helped one of the Polish workers prepare a statement describing the Polish workers on the Trump Tower Project, their non-union wage rates, and their failure to receive wages earned. Diduck claims that he showed this statement to Joseph Rodonich, one of the Union-appointed Trustees.
 
 
 40
 Despite the fact that the employer and shop steward reports omitted the Polish workers, the Trustees relied upon those reports when it threatened Trump-Equitable with work stoppages. Even when it became clear that Trump-Equitable was willing to pay the Kaszycki Corporation's obligations, the Trustees neglected to seek contributions for the non-union workers. By failing to attempt to collect the contributions owed the Funds for both Union and non-union workers at the Trump Tower Project, the Trustees breached their fiduciary duty to "act to ensure that a plan receives all funds to which it is entitled...." Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447, reh'g denied, 473 U.S. 926, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985).
 
 
 41
 The Trustees' failure to investigate Trump-Equitable's potential liability also raises some question about how prudent the Trustees were in recovering delinquent contributions. Although the Kaszycki Corporation was insolvent, Trump-Equitable was not, and its response to the threatened work stoppages demonstrated its willingness to pay the Kaszycki Corporation's obligations. At least one Trustee--Dee--believed Trump-Equitable was making payments for the Kaszycki Corporation because of some agreement it had with the company. Moreover, Senyshyn worked at the Trump Tower Project from late March until August of 1980, which gave him ample opportunity to observe the degree of control Macari was exercising over the job.
 
 
 42
 Despite these facts, the record contains no indication that the Trustees discussed at their meetings the possibility of suing Trump-Equitable or consulted a lawyer to determine Trump-Equitable's potential liability under federal or state law. Judge Stewart noted, for example, that the Trump defendants may be liable under the joint employer doctrine. See NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117 (3d Cir.1982); Hodgson v. Griffin & Brand of McAllen, Inc., 471 F.2d 235 (5th Cir.), cert. denied, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). Considering suing the Kaszycki defendants, but then deciding against it, represented prudent judgment. However, failing even to investigate the possibility of suing Trump-Equitable, despite its willingness to pay the Kaszycki Corporation's obligations, demonstrates a lack of care.
 
 
 43
 This is not to say that the Trustees had a duty to sue Trump-Equitable. Rather, in light of the role Trump-Equitable had assumed, the Trustees had a duty to investigate the possibility of a lawsuit and make an informed decision whether or not to pursue that action.[1]
 
 
 44
 2. RICO Claims Against the Trump Defendants and Senyshyn
 
 
 45
 Diduck sued the Trump defendants and Senyshyn under RICO for their alleged fraud in the Trump Tower Project. Judge Stewart dismissed the RICO claim, holding that "[s]uch an attempt to defraud is too limited to constitute a continuing criminal enterprise under Second Circuit law, which was most recently articulated in Beauford v. Helmsley, 843 F.2d 103 (2d Cir.1988)." In an en banc decision, this Court recently overturned the panel's decision in Beauford. See Beauford v. Helmsley, 865 F.2d 1386 (2d Cir.1989) (en banc). The dismissal of the RICO claim, therefore, is reversed and remanded for reconsideration in light of the more recent Beauford decision.[2]
 
 3. Breach of Fiduciary Duty by Senyshyn
 
 46
 Diduck sued Senyshyn for breaching his fiduciary duty as Trustee, alleging that Senyshyn defrauded the Funds and concealed the Kaszycki Corporation's and Trump-Equitable's failure to contribute to the Funds by filing shop steward reports that omitted the Polish workers. Judge Stewart found that ERISA's three-year statute of limitations, 29 U.S.C. Sec. 1113, barred this claim because Diduck knew of Senyshyn's alleged wrongdoing in June of 1980 but failed to file the complaint until September of 1983. Because ERISA provides a six-year statute of limitations for prosecuting breaches of fiduciary duty arising out of fraud or concealment, Judge Stewart's decision is reversed.
 
 
 47
 ERISA's statute of limitations applicable at the time Diduck filed this action provides:
 
 
 48
 (a) No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
 
 
 49
 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
 
 
 50
 (2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this title;
 
 
 51
 except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
 
 
 52
 For a breach of fiduciary duty involving fraud or concealment, the three-year exception for actual knowledge does not apply, and a party has six years from the time it discovers the breach to bring an action. For all other breaches of fiduciary duty, a party can commence an action within six years of the time the breach occurred, unless the party has actual knowledge of the breach, in which case it must bring the action within three years of the time it learned of the breach. See Fink v. National Sav. and Trust Co., 772 F.2d 951, 956 (D.C.Cir.1985).
 
 
 53
 Judge Stewart applied a three-year statute of limitations, noting that "[t]he gravamen of plaintiff's ERISA claim against Senyshyn is that Senyshyn breached his fiduciary duty as Trustee by failing to collect money owing to the Funds, and by participating in the failure to report the non-union Polish workers in Shop Steward Reports to the Funds" and that Diduck had actual knowledge of this breach. Paragraph 64 of Diduck's amended complaint--incorporated by reference into the breach of fiduciary duty claim--states that Senyshyn's alleged breach of fiduciary duty involved:
 
 
 54
 a scheme or artifice to defraud the Funds by submission of Weekly Payroll Reports and Weekly Shop Steward Reports falsely stating the number of covered employees employed by Kaszycki Corporation and their total wages, and concealing and failing to disclose the true amount of such employees and their total wages.
 
 
 55
 Because the alleged breach of fiduciary duty involved fraud or concealment, Diduck had six years from when he discovered Senyshyn's wrongdoing in June 1980 to file his complaint. Diduck filed his complaint in September 1983 so his claim is not time-barred.
 
 Conclusion
 
 56
 For the reasons set forth above, we reverse and remand. On remand, the amended complaint's second, third, fourth, fifth, sixth, and seventh counts remain for consideration on the merits. This Court's conclusion that the Trustees breached their fiduciary duty, thereby permitting Diduck to prosecute this derivative action, has no bearing on the merits of Senyshyn's alleged breach of fiduciary duty contained in the sixth claim.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 57
 I dissent. A brief elaboration on the facts is an appropriate starting point for my statement of reasons.
 
 
 58
 William Kaszycki, himself a former immigrant from Poland, either arranged for a group of Polish workers to come to the United States on tourist visas, see 8 U.S.C. Sec. 1101(a)(15)(B), or hired them after they arrived. In either event, as temporary visitors for pleasure, the Poles were prohibited from engaging in any employment. 8 C.F.R. Sec. 214.1(e); see Wei v. Robinson, 246 F.2d 739, 743 (7th Cir.), cert. denied, 355 U.S. 879, 78 S.Ct. 144, 2 L.Ed.2d 109 (1957); Matter of New York State Labor Relations Board v. Le Crepe, 78 Misc.2d 171, 173, 355 N.Y.S.2d 515 (1973).
 
 
 59
 On January 29, 1980, Kaszycki and his wholly owned company, Kaszycki & Sons Contractors, Inc., signed a contract with the Trump-Equitable Fifth Avenue Company ("T-E") to demolish the Bonwit Teller building on Fifth Avenue. Kaszycki hired Zbigniew Goryn as supervisor of the job and Bodgan Krawezynski as timekeeper, and these three men hired the members of the so-called "Polish Brigade" to work on the project. However, the Company kept no employment records for these employees. It is not clear whether this was done to mislead the Immigration and Naturalization Service, the Department of Labor or the House Wreckers Union. In any event, according to information in the record, Kaszycki subsequently was indicted on charges of importing Polish aliens, shielding them while they worked illegally, and exploiting them by failing to pay them their full wages. These charges were disposed of by a plea bargain agreement calling for substantial fines and two months in jail.
 
 
 60
 In addition, the Department of Labor sued Kaszycki and his Company for violating the Fair Labor Standards Act by failing to pay the Polish workers their wages, and secured a $570,000 judgment against them. See Donovan v. Kaszycki & Sons Contractors, Inc., 599 F.Supp. 860 (S.D.N.Y.1984).
 
 
 61
 The House Wreckers Union did not catch up with Kaszycki until late March of 1980, when a collective bargaining agreement was signed. Although the agreement provided that membership in the Union was required as a condition of employment, the Company books did not disclose the existence of the Polish workers, and few, if any, of them became Union members.
 
 
 62
 Moreover, as is evident from the $570,000 judgment obtained in Donovan v. Kaszycki, supra, 599 F.Supp. 860, few, if any, of the Polish workers were paid in full. Indeed, it appears likely that the default in payments to these workers is what brought the Union onto the scene. In March 1980, the Polish workers staged a two-day strike because of Kaszycki's failure to pay their wages. Kaszycki succeeded in getting them back to work with promises that he failed to keep and with payment checks that bounced. Within a few days thereafter the Union was on the job.
 
 
 63
 For reasons that are unclear, the Union evidenced no interest in the non-member Polish workers. It did, however, actively represent the Union employees. On several occasions when Kaszycki failed to make payments into the Union's Pension and Insurance Funds on behalf of the Union members, the Union contacted T-E and threatened to close down the job if the payments were not made promptly. In order to keep the job going, T-E satisfied the delinquencies on behalf of Kaszycki, notifying Kaszycki on each occasion that T-E expected reimbursement from Kaszycki and his Company. Neither Kaszycki nor T-E made any payments to the Funds on behalf of the Polish workers, and the Funds did not demand any such payments.
 
 
 64
 Because Kaszycki continued to default in salary payments to the Polish workers, a number of them turned to a lawyer for help. To put pressure on T-E, the lawyer twice filed mechanics liens against the project on behalf of several Polish workers. The pressure worked--T-E paid the delinquencies represented by the liens, again on Kaszycki's behalf, and they were discharged.
 
 
 65
 Plaintiff, Harry Diduck, now brings this derivative action seeking recovery on behalf of the two Funds from all of the above-captioned defendants except the unnamed Trustees of the Funds, whom he describes as "nominal defendants" only. My colleagues try to make these unidentified trustees into something more than "nominal defendants" by stating that T-E was willing to pay the Kaszycki Corporation's obligations and that the trustees of the Funds were negligent in "failing to even investigate the possibility of suing Trump-Equitable, despite its willingness to pay the Kaszycki Corporation's obligations." This attempt must fail. Unless we are prepared to treat payment by one with a gun at his back as a "willing" payment, the T-E defendants were not "willing" payors.
 
 
 66
 For the reasons set forth in the paragraphs that follow, I agree with Judge Stewart that ERISA imposed no legal liability on the T-E defendants to make the Fund payments at issue herein. It follows that the unnamed Trustees then in office could not be held negligent for failing to investigate the possibility of suing them. I emphasize this absence of legal liability because it is determinative not only of a basic issue in the case, but also of Diduck's right to bring this derivative action on behalf of the Funds without first having made a demand for suit upon the incumbent trustees, a matter that will be discussed at a later point in this opinion.
 
 ERISA
 
 67
 Section 515 of ERISA, 18 U.S.C. Sec. 1145, was enacted for the purpose of creating federal statutory duties out of already existing contractual obligations. The statute provides in substance that an employer who is obligated to contribute to a multiemployer plan under the terms of the plan or a collective bargaining agreement shall make such payments in accordance with the terms of the plan or the agreement. In other words, if a company is not an employer under the collective bargaining agreement or the trust indentures, it is not an employer under section 515. International Brotherhood of Painters and Allied Trades Union v. George A. Kracher, Inc., 856 F.2d 1546, 1547-50 (D.C.Cir.1988); Massachusetts Laborers' Health and Welfare Fund Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co., 827 F.2d 1454, 1456-57 (11th Cir.1987); Xaros v. U.S. Fidelity and Guaranty Co., 820 F.2d 1176, 1178-80 (11th Cir.1987).
 
 
 68
 The T-E defendants, either collectively or individually, were not the contractually obligated employers of the Polish workers within the meaning of section 515. The Collective Bargaining Agreement names Kaszycki & Sons, Contractors as the "Employer" and requires that the "Employer" shall make payments to the Insurance Trust Fund and Pension Trust Fund. The Indenture of the Insurance Trust Fund and the Agreement and Declaration of Trust for the Pension Fund identify the contractors with whom House Wreckers Union Local 95 has executed collective bargaining agreements as the "Employers". Not one of the T-E defendants is mentioned anywhere in the three pertinent documents.
 
 
 69
 My colleagues state "Judge Stewart noted, for example, that the Trump defendants may be liable under the joint employer doctrine." I do not find this to be so. Judge Stewart pointed out that the joint employer doctrine was developed in NLRA cases and has been applied sparingly in suits arising under ERISA. He then rejected as a matter of law plaintiff's contention that the T-E defendants were joint employers. In my opinion, the NLRA doctrine of joint employer should play no role whatever in the instant case.
 
 
 70
 Although Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988), involved a claim for fund contributions coming due after the expiration of collective bargaining agreements, the Supreme Court's opinion in that case outlines the path we should follow here. The Court held that the district court correctly denied recovery under section 515 and correctly refused to exercise jurisdiction over the claim of an unfair labor practice. The Court referred to a statement in the legislative history of section 515 that "[f]ailure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans," id., 108 S.Ct. at 834, and said that this history "explains that Congress added these strict remedies to give employers a strong incentive to honor their contractual obligations...." Id. at 835. The Court emphasized that the text of section 515 "omits any reference to a noncontractual obligation imposed by the NLRA." Id. at 834.
 
 
 71
 Most of the lower courts have interpreted section 515 in the same manner. The consensus of those courts is that ERISA does not require employers to provide their employees with pension or insurance plan benefits and the obligation to do so is imposed, if at all, by and pursuant to contract. Accordingly, whether a defendant is a joint employer under the FLSA is of no controlling significance in a section 515 case. Indeed, the issue of joint employment should be resolved in the first instance by the NLRB, not the court. See International Brotherhood of Painters and Allied Trades Union v. George A. Kracher, Inc., supra, 856 F.2d at 1549; Massachusetts Laborers' Health and Welfare Fund v. Starrett Paving Corp., 845 F.2d 23, 25-26 (1st Cir.1988); Xaros v. U.S. Fidelity and Guaranty Company, supra, 820 F.2d at 1178-80.
 
 
 72
 Assuming for the argument only that the issue of joint employer status was properly before the district court, I agree with Judge Stewart that the T-E defendants were not joint employers of the Polish workers hired by Kaszycki. The Department of Labor, which made a thorough investigation and then sued Kaszycki alone, obviously did not think that any of the T-E defendants were joint employers with Kaszycki. Neither did Judge Sprizzo who heard the Labor Department's case and held that "Trump did not take over the responsibility for paying the non-union employees." Donovan v. Kaszycki, supra, 599 F.Supp. at 866. Neither did the grand jury which indicted Kaszycki alone.
 
 
 73
 There was no overlap in either ownership or management between the T-E defendants and Kaszycki & Sons. Thomas Macari, T-E's vice president in overall charge of the Bonwit Teller project, swore that he did not hire the Polish workers, did not lay off or terminate any of them and did not supervise their work. Ample support for this testimony can be found in the fact that the Polish workers could not speak English and Macari could not speak Polish. Insofar as the relationship between Macari and Kaszycki was concerned, one former employee of Kaszycki made the cogent observation that they were always fighting. Indeed, the lawyer who filed the mechanics liens said that the T-E people asked him to consider joining T-E in a suit against Kaszycki. It is undisputed that neither Macari nor any of the T-E defendants ever saw Kaszycki's contracts with its union. The testimony also is undisputed that T-E advanced money that Kaszycki owed the Funds and other creditors in order to avoid "work stoppages that would have delayed the ultimate opening of Trump Tower at a cost of millions of dollars." Clearly, Diduck did not satisfy the tests for joint employment applied by this Court in Clinton's Ditch Cooperative Co. v. NLRB, 778 F.2d 132, 138 (2d Cir.1985), cert. denied, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986) and International House v. NLRB, 676 F.2d 906, 913 (2d Cir.1982), in both of which cases, incidently, the original decision on the issue was made by the Board.
 
 THE PRE-SUIT DEMAND
 
 74
 Judge Stewart held, and my colleagues and I agree, that Diduck is suing derivatively on behalf of the Funds. Congress has placed the power to collect "promised contributions" under ERISA in the hands of fund trustees. See Alfarone v. Bernie Wolff Constr. Corp., 788 F.2d 76, 79-80 (2d Cir.), cert. denied, 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986); Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 337-38 (3d Cir.1984). Because the right to sue for promised contributions belongs to the trustees, fund participants such as Diduck cannot exercise the right derivatively without first giving the trustees the opportunity to compel payment. "A derivative action 'in essence is nothing more than a suit by a beneficiary of a fiduciary to enforce a right running to the fiduciary as such.' " Wright, Law of Federal Courts, 487 (4th ed. 1983) (quoting Goldstein v. Groesbeck, 142 F.2d 422, 425 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590 (1944)). Before a participant such as Diduck can sue an employer for promised fund contributions, he must show either that he made a demand upon the trustees for suit or that such a demand would have been futile.
 
 
 75
 The case of Katsaros v. Cody, 744 F.2d 270, 280 (2d Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), relied upon by Diduck, is not binding authority to the contrary. Katsaros antedated Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570 and n. 10, 105 S.Ct. 2833, 2840 and n. 10, 86 L.Ed.2d 447 (1985), and was an equitable action seeking removal of all trustees. This Court's decision in Lewis v. Graves, 701 F.2d 245, 247 (2d Cir.1983), states the correct rule, which is as above stated.
 
 
 76
 Diduck alleges that his causes of action "are brought as derivative causes of action pursuant to Rule 23.1 of the FRCP on behalf on the Funds." Rule 23.1 provides in substance that, in a derivative action brought thereunder, the complaint must be verified and must allege "with particularity" the efforts made by the plaintiff to induce suit by the [trustees] and the reasons for the plaintiff's failure to obtain the desired action or for not making the effort to secure it. Similar demand requirements were developed under the common law of trusts and they are applicable not only in ERISA cases, Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., supra, 472 U.S. at 570-72, 105 S.Ct. at 2840-41, but also in non-ERISA derivative actions brought by trust beneficiaries. See, e.g., Riviera Congress Associates v. Yassky, 18 N.Y.2d 540, 547, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966); Western Railroad Co. v. Nolan, 48 N.Y. 513, 517-18 (1872); Levy v. Carver Federal Savings and Loan Ass'n, 18 A.D.2d 1062-63, 239 N.Y.S.2d 384 (1963). Moreover, where, as here, there are multiple trustees, the common law requirement of pre-suit demand applies when a derivative action is brought against a single errant trustee as well as when it is brought against a wrongdoing third party. Backer v. Levy, 82 F.2d 270, 274 (2d Cir.1936); Smith v. David Stevenson Brewing Co., 117 A.D. 690, 694-95 (1907). This is because the faithful trustees have the primary right, indeed the primary duty, to proceed against their wrongdoing colleague. See Matter of Rothko, 43 N.Y.2d 305, 320, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977); Parker v. Rogerson, 49 A.D.2d 689, 690, 370 N.Y.S.2d 753 (1975) (mem.).
 
 
 77
 Management of Local 95's Pension Fund was placed in the hands of six Trustees, three representing the Union, two representing the Wrecking Contractors Association of New York, Inc. and one representing the Non Association Employers. Concurrence by a majority was necessary for any action taken, and, in case of a deadlock, provision was made for arbitration. The Trust Fund Indenture provided for four Trustees, two being named by the Union and two by the Association. A majority vote was required for all action taken, and, again, provision was made for arbitration in the event of a deadlock. The basic reason for requiring a demand upon these Trustees is that it gives them an opportunity to continue in their normal status as conductors of the trust affairs. See Lewis v. Graves, supra, 701 F.2d at 247; Struble v. New Jersey Brewery Employees' Welfare Trust Fund, supra, 732 F.2d at 337. It follows that, to be efficacious for this purpose, the demand must be made upon the Trustees who are in office at the time suit is brought. Brody v. Chemical Bank, 517 F.2d 932, 934 (2d Cir.1975).
 
 
 78
 Diduck's complaint was not verified as required by Rule 23.1. It does not allege the making of a demand upon incumbent trustees, some of whom may not even have been trustees at the time complained of. See Velez v. Feinstein, 87 A.D.2d 309, 316, 451 N.Y.S.2d 110, motion for leave to appeal denied in part and dismissed in part 57 N.Y.2d 605, 454 N.Y.S.2d 1031, 440 N.E.2d 1342 and 57 N.Y.2d 737, 454 N.Y.S.2d 987, 440 N.E.2d 1334 (1982). Neither does it allege "with particularity" why a demand would have been futile. Diduck's qualifications as a representative of the two trusts are at best questionable. He has been at loggerheads with Union officials for twenty-five years. He did not endear himself to the membership by his previous suit against the Union seeking $1 million in damages. He has published correspondence in which he described a Union official as a "FAKER and LIAR". He admittedly is carrying on a personal vendetta against Senyshyn.
 
 
 79
 If Diduck were making an individual claim against Senyshyn seeking recovery for only his own personal loss, a prior demand would have been unnecessary. However, when Diduck attempts to leapfrog over nine trustees and assert a claim on their behalf against both the T-E defendants and Senyshyn, he disregards not only the provisions of Rule 23.1 but also longstanding principles of trust law. If we permit this blatant disregard of established law, we extend an open invitation to all litigious trust members to proceed in the same manner. I am not prepared to do this.
 
 THE RICO CLAIM
 
 80
 As my colleagues correctly note, Beauford v. Helmsley, 843 F.2d 103 (2d Cir.1988), the case on which Judge Stewart relied in dismissing the RICO claims, was reversed by an en banc court, 865 F.2d 1386 (2d Cir.1989). This does not mean, however, that the RICO cause of action must be reinstated. The rule is well established that "[i]f a third person commits a tort with respect to trust property, the beneficiaries cannot maintain a suit in equity against him, as long as the trustee is ready and willing to proceed against him." IV Scott, The Law of Trusts (3d ed. 1967) at 2336. Assuming for the argument only that the T-E defendants and Senyshyn did violate civil RICO, 18 U.S.C. Sec. 1964, the victims of their wrongful acts were the Funds, and the primary right to seek redress for the Funds' damages belonged to the Funds' Trustees. See Warren v. Manufacturers National Bank, 759 F.2d 542, 545 (6th Cir.1985); Nordberg v. Lord, Day & Lord, 107 F.R.D. 692, 698-700 (S.D.N.Y.1985). Compliance with the pre-suit demand requirements of Rule 23.1 and the common law therefore is as essential in Diduck's RICO cause of action as it is in his ERISA claim.
 
 
 81
 Putting aside for the moment the question of inadequate demand, I find no merit in Diduck's substantive contention that the T-E defendants committed a RICO violation. In substance, Diduck alleges upon information and belief that Kaszycki and Senyshyn devised a scheme to defraud the Funds by concealing the number of covered employees employed by the Kaszycki corporation. Diduck does not say why Senyshyn, a trustee of the Funds, would enter into such a scheme. Nevertheless, the complaint alleges that the T-E defendants knowingly and willingly conspired with Kaszycki and Senyshyn or knowingly aided and abetted them in carrying out their scheme. To support this allegation, Diduck alleges upon information and belief that the T-E defendants "understood the scope of the Collective Agreement" and conspired to hide the number of covered employees by sending the Funds payment checks "purporting to constitute the contributions owed to the Funds by Kaszycki Corporation by virtue of the Collective Agreement...." Plaintiff has shown no factual basis for this charge. Although in theory at least the "nominal" trustees, particularly the five representing the Union, should have favored recovery by the Funds, evidence that they were misled by the T-E defendants is conspicuous only by its absence.
 
 
 82
 What the record does show is that the Kaszycki Corporation kept its own books and that the T-E defendants had nothing to do with preparing or forwarding the periodic work reports to the Union. The undisputed sworn testimony is that neither Macari or any of the T-E defendants had ever seen the Collective Bargaining Agreement. They got the figures for the payments made by them from the Employer Ledger maintained by Kaszycki, a ledger that was available at all times for inspection by the Funds. Both the pertinent ledger page and copies of the checks are exhibits in the record. Diduck has not advanced one iota of proof to indicate that the T-E defendants knew or had reason to know that these figures did not accurately represent the amount owed. Moreover, as pointed out above, the T-E defendants were not obligated either to make additional payments or to see that they were made by Kaszycki. No relationship, fiduciary or otherwise, existed between the T-E defendants and the House Wreckers Union or its Trust Funds.
 
 
 83
 When a defendant moves for summary judgment, a plaintiff may not rest on the allegations of his pleadings, particularly where as here, they are upon information and belief and unverified. Indeed, even on a Rule 9(b) motion, unverified pleadings on information and belief are not regarded with particular favor. See Di Vittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir.1987). In response to a defendant's summary judgment motion, the plaintiff must show by affidavit or equally probative evidence the existence of specific facts creating a genuine issue for trial. Where, as here, there are multiple defendants, each defendant is entitled to know why trial as to him may proceed. Id. Surmise, conjecture and conclusory allegations are not enough; plaintiff must make an affirmative showing that his version of events is not fanciful. United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir.1982). Insofar as the T-E defendants are concerned, plaintiff has failed to satisfy this burden.
 
 
 84
 For all of the reasons above stated, I would affirm.
 
 
 
 *
 Honorable Robert W. Sweet, Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Judge Van Graafeiland's dissent suggests that Diduck's derivative action should be dismissed because "[Judge Stewart] rejected as a matter of law plaintiff's contention that the [Trump-Equitable] defendants were joint employers," Dissent Op. at 922, and because Diduck failed to make a pre-suit demand upon the trustees or show that such a demand would be futile. However, Judge Stewart reached no conclusion regarding whether Trump-Equitable in fact was a joint employer, stating that "[Diduck] has failed to show that the Trustees were aware of sufficient facts tending to show that the Trump defendants were joint employers with Kaszycki." Dist.Ct.Op. at 8 (emphasis added). Further, he dismissed the derivative action on the sole and "dispositive" ground that Diduck had failed to prove that the Trustees had breached their fiduciary duty. Id. at 3. The question of whether Diduck made a pre-suit demand or whether one would have proved futile is best left to Judge Stewart to resolve on remand
 
 
 [2]
 Judge Van Graafeiland dissents from this reversal, noting that the pre-suit demand requirement applies to RICO claims and stating that "I find no merit in Diduck's substantive contention that the [Trump-Equitable] defendants committed a RICO violation." Dissent Op. at 924. However, because Judge Stewart dismissed Diduck's RICO claim on the narrow ground that the panel's decision in Beauford barred it, consideration of the merits of that claim is best left to Judge Stewart on remand