Harry J. DIDUCK, individually and as a participant in the Local 95 Insurance Trust Fund and the Local 95 Pension Fund, and on behalf of all other persons who are, will be, or have at any time since January 1, 1980 been participants or beneficiaries in the Funds, similarly situated, Plaintiff,

v.

KASZYCKI & SONS CONTRACTORS, INC., William Kaszycki, John Senyshyn, Trump–Equitable Fifth Avenue Company, Donald J. Trump, Donald J. Trump d/b/a the Trump Organization, and the Equitable Life Assurance Society of the United States, Defendants.

No. 83 Civ. 6346 (CES).

United States District Court, S.D. New York.

April 24, 1991.

Supplemental Decision April 30, 1991.

Hall & Sloan by Wendy Sloan, New York City, for plaintiff.

Shea & Gould by Fran M. Jacobs, New York City, for Trump.

Mait, Wang & Simmons by Robert Wang, New York City, for Senyshyn.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff Harry J. Diduck ("Diduck") brings this class action[1] against defendants William Kaszycki and Kaszycki & Sons Contractors, Inc., defendant John Senyshyn, a trustee of the House Wreckers' Union Local 95 ("the Union"), and defendants Trump–Equitable Fifth Avenue Co. ("Trump–Equitable")[2], the Trump Orga-

---

1. In a Memorandum Decision dated March 28, 1990, we certified a class consisting of all persons who are, will be, or have been at any time since January 1, 1980, participants in and/or beneficiaries of the Insurance Fund and the Pension Trust Fund for House Wreckers' Union Local 95.

2. Trump–Equitable was a partnership of Donald J. Trump and Equitable Life Assurance Society of the United States.

nization, Inc., Donald J. Trump, Donald J. Trump d/b/a The Trump Organization, and the Equitable Life Assurance Society of the United States (the "Trump defendants").

Diduck, a beneficiary of the Union's pension and welfare insurance funds, alleges that Senyshyn breached the fiduciary duty imposed upon him as a trustee of the funds by section 404 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1104. Plaintiff alleges Senyshyn breached his fiduciary duty by failing to collect pension and welfare fund contributions due on the wages of non-union, Polish workers.

He also alleges that the Trump defendants participated in the breach, thereby becoming jointly and severally liable. He seeks as damages the contributions and liquidated damages, which the funds would have recovered but for the defendants' breach of duty and participation therein, and interest from April 1, 1980, in the sum $1,027,858.10. Plaintiff also seeks his necessary costs and disbursements of the action and a reasonable attorneys' fee.

A non-jury trial of sixteen days was held. The following constitutes our findings of fact and conclusions of law as mandated by Rule 52 of the Federal Rules of Civil Procedure.

## FACTS

Trump–Equitable hired William Kaszycki and his company Kaszycki and Sons Contractors, Inc. ("Kaszycki Corporation" and collectively "the Kaszycki defendants") to demolish the old Bonwit Teller building in midtown Manhattan at 56th Street and Fifth Avenue to make way for the Trump Towers. An agreement was signed on January 29, 1980.[3] Under the agreement Trump–Equitable was to pay the Kaszycki Corporation $775,000 for its demolition work. The Kaszycki Corporation was responsible for providing labor, equipment, and supplies.

Before this time Kaszycki had been engaged in doing construction cleaning (i.e., cleaning up after a building has been constructed) through a company called Interstate Window Cleaning Company. He had never before performed a total demolition job involving completely taking down a building.

Immediately before doing the demolition work on the Bonwit Teller building at 56th Street ("the Bonwit Teller job" or "the 56th Street job"), Kaszycki and Interstate performed interior demolition work[4] on a contiguous building at 57th Street (the "57th Street job"). That building was owned by Donald J. Trump who leased it to Allied Stores, parent of the Bonwit Teller company. Testimony established that Donald Trump visited the 57th Street site and observed Kaszycki's Polish workers, noting that they were "good hard workers." Tr. 2181. Workers also observed Trump visiting the job site of the Bonwit Teller demolition job. Tr. 647–50; 1169–71; 1320–21.

Zbigniew[5] Goryn was Kaszycki's foreman for both the 57th Street job and the Bonwit Teller job. Goryn testified that while he was on the 57th Street job Kaszycki told him he had to join the union (Local 23 of the Laborers' International Union of North America) and sign up five of the workers for the union as well. Kaszycki withheld money for union dues from their wages. Tr. 2182. However, they later discovered that they were not members of the union because their dues were never forwarded to the union. Tr. 2183.

Most, if not all, of Kaszycki's Polish workers had recently arrived from Poland. They were undocumented and worked "off the books." Tr. 725. No records were kept, no Social Security or other taxes were withheld, Tr. 715, 724, 728, and they were

---

**3.** Although Kaszycki's contract with Trump–Equitable was not signed until January 29, 1980, Kaszycki's workers started working on the Bonwit Teller building in late December or early January. Tr. 31; 576–77; 2178–2179; 2189.

**4.** Interior demolition work involves work such as removing interior structures. Building demolition involves the destruction of an entire building, i.e., razing it to ground level.

**5.** A shortened form of "Zbigniew" is "Ziggy."

not paid in accordance with wage laws. *See Donovan v. Kaszycki*, 599 F.Supp. 860, 864 (1984). They were told they would be paid $4.00 or in some cases $5.00 an hour for working 12–hour shifts seven days a week. In fact they were paid irregularly and incompletely, sometimes with Kaszycki's personal checks which were returned by the bank for insufficient funds. Tr. 153–54. Kaszycki was later found to have violated the sections of the Fair Labor Standards Act requiring recordkeeping, payment of overtime, and minimum wages. *See Donovan v. Kaszycki*, 599 F.Supp. at 867–69.

An article appeared in the New York *Times* on or about March 16, 1980 reporting on the demolition. In late March 1980 union workers from Housewreckers Local 95 came on the job. The Polish workers were told they would be let go, but some continued to work until June 1980. Defendant John Senyshyn started working on March 24, 1980. Tr. 2051, 2059. Senyshyn was the shop steward for at least the first three weeks he worked on the Bonwit Teller job. Tr. 2061–62. He was also the president of Local 95 in 1980. Tr. 2050. As president he was a trustee of the union's pension and welfare funds.[6] Tr. 1388; 1390–91.

Senyshyn worked for about two and a half to three weeks and then worked very briefly at another Local 95 job in the Bronx. Tr. 2054–55. He returned to the Bonwit Teller job and worked there through August 1980.[7] Tr. 2060–61.

*The Shop Steward Reports Submitted by Senyshyn*

Senyshyn was the shop steward for the first three weeks he worked on the Bonwit Teller job.[8] Tr. 2061–62. He submitted three shop steward reports, the first dated March 27, 1980.[9] Senyshyn's shop steward report for the week ending March 27 listed 12 workers, including Senyshyn himself. Pltf's Exh. 88A. The employer's report for the week ended March 25 also listed 12 workers. Pltf's Exh. 89C. Senyshyn's two other reports show 15 workers, Pltf's Exh. 88B, and 16 workers, Pltf's Exh. 88C. The employer's reports for April 1 and April 8 both show 16 workers. Pltf's Exh. 89D, 89E.

*The Shop Steward Reports and the Employer's Reports*

The shop steward report form is entitled "Weekly Shop Stewards [sic] Payroll Report." *See e.g.*, Pltf's Exh. 88A. The basic purpose of the shop steward report is to list those working on the job and their earnings. Tr. 1907. The form has a space for the employee's book number. Pltf's Exh. 88A. If there is no book number, that is an indication that the worker is not a union member. Tr. 1442–43. The shop steward reports were sent by the shop steward to the administrators of the pension and welfare funds. Tr. 1417–18. If the shop steward report listed non-union workers on the job site, the administrator

---

**6.** The trustees for the funds consisted of an equal number from the union and from employers. The pension fund had three trustees from the union, which were the president, secretary-treasurer, and the business manager of Local 95. Tr. 1391. The insurance fund had only two union trustees, the president and the business manager. *Id.*

**7.** Although Senyshyn testified that after he returned to the Bonwit Teller site his job was only "cleaning up the sidewalks," Tr. 2055, there is credible evidence that he supervised and directed the work of the union workers. For example, Thomas Macari, Trump–Equitable's vice president who was in charge of the Bonwit Teller job, observed him giving directions to the union workers. Tr. 2110–11. In addition, Polish worker Adam Mrowiec testified that he saw a man fitting Senyshyn's description giving directions to the union workers on the job. Tr. 1323, 1326. Thus, at the very least, Senyshyn worked on the job site, not just on the sidewalks, and in the very same areas as the Polish workers.

**8.** When Senyshyn left the Bonwit Teller job after three weeks, John Osijuk became the shop steward. Tr. 2055. The remaining shop steward reports for the Bonwit Teller job were signed by Osijuk. Tr. 2055–56. Osijuk's shop steward reports followed Senyshyn's example and omitted the Polish workers. Pltf's Exh. 88D–88S.

**9.** The dates on the other two shop steward reports are not legible on Pltf's Exhibits 88B and 88C, although Senyshyn identified them as the reports he submitted.

would bring the listing to the secretary-treasurer. *Id.;* Tr. 1442–43.. The administrator would turn that information over to the union's business manager who would then get the workers into the union. *Id.* The only way for the union to find out that there were non-union workers on a job was through the shop steward report. Tr. 1443.

The employer also prepared a weekly payroll report listing employees and their earnings on a form provided by the union. The employer's weekly payroll report was also sent to the administrators of the union's pension and welfare funds. Tr. 842.

The shop steward report was used by the fund administrators as a cross-check on the employer's weekly payroll reports. Tr. 1907. The pension fund administrator took information from the employer's report regarding the employee's earnings and gave credit on the employee's record card. *Id.* These cards were maintained for both members of Local 95 and nonmembers. Tr. 1908. Information both for members and for nonmembers of Local 95 was typically included in the employer's weekly report. *Id.* The shop steward's report was supposed to include basically the same information as the employer reports. *Id.*

If the total earnings reported by the employer were greater than the total earnings on a corresponding shop steward report, the pension fund administrator used the larger figure. Tr. 1916–17. But if the total earnings on the shop steward report were greater than that on the employer's report, the administrator would try to work it out with the employer. Tr. 1917.[10] If the administrator discovered any delinquencies in payment of fund contributions by an employer, the matter was reported at the meeting of the funds' trustees. Tr. 1918. The trustees would notify the employer,

and then, if they did not pay, the union would "take action on the job," i.e., threaten to stop work. Tr. 1919.

Kaszycki's employer's report was prepared by Doris Butler, Kaszycki's bookkeeper. Tr. 841–42. She prepared the report based on information provided to her by the union timekeeper. Tr. 834–35, 842–43. She sent them to Thomas Macari, Trump–Equitable's vice president who was in charge of the Bonwit Teller demolition job. Tr. 843–44; 2087; Pltf's Exh. 136. Macari admitted that the employer's reports were part of the backup he examined before authorizing payments by Trump–Equitable to the pension/welfare funds. Tr. 2157; *see also* Tr. 843–44, Pltf's Exh. 136 at 3.[11]

While both the shop steward reports and the employer's reports show that only 12 to 15 workers were on the Bonwit Teller job during the three weeks after March 24, 1980, the evidence clearly shows that there were considerable numbers of Polish workers doing demolition covered by the contract who should have been listed on both the shop steward reports and the employer's reports. Polish worker Wojciech Kozak estimated that in March 1980, there were 30–40 Polish workers on the day shift and 150 at night. Tr. 1162–63. Another worker estimated 40–60 on the day shift. Tr. 1311. A third estimated 80–100. Tr. 385. Data collected in early 1981 by James Dondzil, the investigator for the United States Labor Department, lists 53 Polish workers for the period of late March to early April.[12] Pltf's Exh. 101. Although the exact number of Polish workers is not available because no records were kept, all of the numbers are dramatically different from the 12–15 workers reported by Senyshyn on the shop steward report. Further, the Polish workers' estimates are

---

**10.** The administrator for the pension fund was Joe Dektarovich. He testified that the shop steward reports came to the welfare fund administrator, Mr. Rusetsky. Tr. 1926. Dektarovich believed that Rusetsky checked the shop steward reports; thus, Dektarovich himself only occasionally looked at them. *Id.*

**11.** Contrary to Macari's testimony that he "did not calculate, did not figure [the employer report papers]," Tr. 2157, the evidence shows that

he examined the payroll figures on the employer's report very carefully. Indeed, Kaszycki's bookkeeper made a notation on one report that "Tom Macari said there might be an error here." Tr. 843–44, Pltf's Exh. 136 at 3.

**12.** This figure includes workers who listed hours for the weeks ending 3/29/80 and 4/5/80, regardless of shift (day/night).

based on their personal observations of the numbers of workers visible on the job site.

The Polish workers were obvious not only in numbers but also in appearance. In contrast to the union workers the non-union, Polish workers were distinguished by the fact that most of them did not wear hard hats. Tr. 1317–18. In addition the Polish workers staged several very visible work stoppages because they were not being paid their wages.[13]

We do not find credible Senyshyn's unsupported assertion that he thought the Polish workers were members of Local 23, a sister union. Senyshyn testified that Mike Novak, Local 95's business manager, introduced Ziggy Goryn (Kaszycki's foreman) as the shop steward for Local 23.[14] Tr. 2052–53. Goryn denied that any such conversation took place. Tr. 2186–87. As a foreman Goryn was a member of management, preventing him from being a union steward, a fact of which he was well aware. *Id.*

*Macari's Role as Trump–Equitable's Agent*

Thomas Macari was a vice president of Trump–Equitable and its manager in charge of the demolition of the Bonwit Teller Building Tr. 1097; 2087. Macari was experienced in construction work. As a youth, he had worked as a laborer for a contractor during the summer. Pltf's Exh. 18A at 5. In addition he worked for several retail stores, including Saks where he oversaw construction jobs. *Id.* at 6. And he was familiar with the various unions on the Bonwit Teller job. On direct examination he easily recited the four unions present on that job, Tr. 2089, a striking contrast to his frequent "I don't recall" statements regarding most other aspects of that job.

Macari was frequently on the Bonwit Teller job site to oversee the everyday progress of the work. Tr. 655. He often conferred with both the union foreman and with Ziggy Goryn, the Polish workers' foreman. Tr. 652. Macari knew that there were Polish workers hired by Kaszycki who were doing demolition work on the Bonwit Teller job. Tr. 169; Pltf's Exh. 4. He also knew that they were non-union workers and were not being paid in the same way and with the same regularity as the union workers. Pltf's Exh. 11 at 5.

Ample evidence of Macari's extensive involvement and knowledge of the work of the Polish workers was presented by the testimony of a lawyer named John Szabo. Szabo first contacted Macari on March 24, 1980 to enlist his aid in getting payment for six workers who had asked Szabo to help them get their wages when Kaszycki's checks to them for wages bounced. Tr. 162–63. Macari made numerous contacts with Kaszycki to get the workers paid. Tr. 164; 166; 171. By April 4, 1980 they were finally paid $4738 in outstanding wage claims. Tr. 174–76.

Shortly thereafter other Polish workers also asked Szabo's help in getting paid by Kaszycki. Szabo notified Macari on April 26 that there were new claims for unpaid wages totaling $12,176. Tr. 176–77. This amount grew as time went on and the claims were not satisfied, until by July 17, the claims totaled $103,944. Once again, Macari was consistently and deeply involved in activities designed to get Kaszycki to pay the Polish workers. *See e.g.,* Tr. 180; 182–191. For example, Macari threatened to withhold Kaszycki's progress payment until the Polish workers were paid. Tr. 178.

Macari was also personally involved in paying the Polish workers. On one occasion Macari brought cash to Goryn, the foreman for the Polish workers. Tr. 1328. Goryn distributed the money to some of the workers. Adam Mrowiec, a Polish worker,

---

**13.** One Polish worker, Jan Bogdan, testified that he kept a calendar of his work on the Kaszycki job. Tr. 1234–1235. It shows work stoppages by the Polish workers on February 27–28, March 23–25, and April 26–May 9. Pltf's Exh. 105A–1. Other Polish workers also testified that there were strikes. *See e.g.,* Tr. 53–54; 383–385.

**14.** A few Polish workers thought for a short time they were members of Local 23. Tr. 131, 1308, 1335–37. However, Senyshyn has presented no evidence, other than his alleged conversation with Mike Novak and Ziggy Goryn, that he became aware of that perception.

testified that Goryn paid only those workers who would give him a $50. bribe. Tr. 1331. On two other occasions, in May 1980, Macari paid the Polish workers himself in his little office at the job site. Tr. 215–16; 702–03.

On or about June 23, 1980, Macari decided that the Polish workers were no longer needed, and they were let go. Tr. 196; 709.

On May 9, 1980 on behalf of Trump–Equitable, Macari took over the finances of the demolition job from Kaszycki. On that date a special account was opened in the name of Kaszycki & Sons requiring Macari's signature on all checks and for any withdrawals. Tr. 656–57. The bank signature card identified Macari as Vice–President of Kaszycki & Sons, even though he never held that position. Tr. 658–59; Pltf's Exh. 130. The purpose of this account was to be sure that payment was made to the union people as well as to the pension and welfare fund, taxes, insurance, and sick payments. Tr. 656–57. Payments by Trump–Equitable to Kaszycki & Sons were made only to this account. Tr. 662. No payments on the construction job were made directly to William Kaszycki after May 9, 1980. *Id.*

After May 9, Macari saw to it that bills were paid, that the workers were paid, that work was done, and personally signed for deliveries. *See* Pltf's Exh. 43–83. He actively participated in paying the union workers. Tr. 665–666. Trump–Equitable paid the union workers' payroll and suppliers of materials for the demolition job from this special account. Tr. 683–684. In addition Trump–Equitable paid bills for the demolition job directly, apart from the special account. Tr. 687.

### Contributions to the Pension/Welfare Funds

Although union workers came on the job in late March, no contributions were made to the pension and welfare funds until May 20, 1980. Pltf. Exh. 34; Tr. 1924. Contri-butions were made in June and July, but those due for July and August were not paid until mid-October. The subject of delinquent contributions for the Kaszycki job was discussed at meetings of the funds' trustees on June 16, September 8, October 20, and December 1, 1980. Pltf's Exh. 108. Trustee Senyshyn was present at each meeting except the June 16 one, at which it was resolved that a work stoppage be imposed on Kaszycki. *Id.* When he was present Senyshyn made no comments regarding the amount of contributions due from the Kaszycki job. *Id.* The administrator of the pension fund, Joe Dektarovich, stated that the shop steward reports submitted in September alerted the union to the fact that the job was still going on and that contributions were still outstanding. Tr. 1924.

Macari knew that Senyshyn was the union president as well as the shop steward. Tr. 2109–10. Senyshyn and Joe Dektarovich ("Dee") went to Macari on behalf of the funds and asked him to make contributions. *Id.* Macari arranged for Trump–Equitable to make payments to the Pension/Welfare Funds when the union threatened to shut the job down if the payments were not made within two hours. Tr. 2091–92. Before authorizing payment, Macari carefully scrutinized the list of employees whose wages formed the basis for the demanded contributions. Tr. 843–44; Pltf's Exh. 136 at 3. The list he consulted was the employer's report which included only union members. *Id.* Trump–Equitable made payments to the Funds in this manner on six occasions. Pltf's Exh. 33A–33L. Thus, we find that Macari knew that contributions were being sought and made on only union member's wages.

### The Collective Bargaining Agreement

By its terms the collective bargaining agreement between Kaszycki & Sons and Housewreckers Union Local 95 covers the period from July 1, 1978 to June 30, 1981. Pltf's Exh. 1, ¶ 40.[15] The Agreement re-

---

**15.** Paragraph 40 of the Agreement reads, "[t]his Agreement shall be effective July 1, 1978 and shall continue in full force and effect until and including June 30, 1981." The preamble of the Agreement states that it was made the "17th day of August, 1978." The Agreement does not indicate the date on which it was signed by Kaszycki and Local 95. In a pre-trial (amended)

quired the employer to make payments to the insurance fund at the rate of eight per cent of the "total wages paid to *workers covered by this agreement.*" *Id.* at ¶ 33 (emphasis added). Similarly, contributions to the Pension Trust Fund were to be made at the rate of ten per cent of the total wages of workers covered by the agreement. *Id.* at ¶ 34.

Under Paragraph 23, "work covered" is defined as "workers under the Union's jurisdiction in all labor connected with the demolition of any building." *Id.* The agreement defines "demolition" to include "its usual and customary meaning," as well as, among other things, all work involved in the removal and loading of all materials and debris; the cleaning, removal and loading of all brick; the operation of jack hammers, and the burning of iron and steel with acetylene torch. *Id.* Under this definition, the Polish workers were doing work covered by this agreement. *See e.g.,* Tr. 41, 125, 382, 1159, 1244.

The administrator of the pension fund, Joe Dektarovich, understood the contract to require employer contributions to the funds on behalf of "whoever was working for them," i.e., union and non-union workers alike. Tr. 1905. Joseph Rodonich, the secretary-treasurer of Local 95, had the same understanding. Tr. 1523–24.

Before signing the contract with Trump–Equitable, Kaszycki talked to Senyshyn and Mike Novak, business manager for Local 95. Tr. 619. Kaszycki understood that he was going to sign a contract with Local 95. Tr. 621. Kaszycki told Macari about the collective bargaining agreement at some time after the agreement was signed. Tr. 694.

---

order dated June 29, 1990, we ruled that paragraph 40 in effect made the terms of the Agreement retroactive to the beginning of the demolition job in early 1980. *See Diduck v. Kaszycki,* No. 83 Civ. 6346 (S.D.N.Y. June 29, 1990) at 6.

16. The term "fiduciary" is defined under ERISA as follows:

(21)(A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan

## CONCLUSIONS OF LAW

This court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1).

It is undisputed that the Pension and the Insurance (Welfare) Funds for Housewreckers Local 95 are and at all relevant times were employee benefit plans within the meaning of ERISA, 29 U.S.C. § 1002(1), (2) and (3). They were also multiemployer funds within the meaning of § 3 of ERISA, 29 U.S.C. § 1002(37).

During the time that he was a trustee of the pension fund for Local 95, John Senyshyn was a fiduciary as that term is defined by ERISA.[16] Further, section 404(a)(1)(A) of ERISA describes the fiduciary's duty as follows:

[he] shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and their beneficiaries; and ... defraying reasonable expenses of administering the plan.

Section 404(a)(1)(B) provides that a fiduciary shall discharge his duties

with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1)(A) and (B).

The Second Circuit has already noted in its opinion on this case that, "Under ERISA, trustees have a fiduciary duty to 'act to ensure that a plan receives all funds to which it is entitled, so those funds can be used on behalf of participants and beneficiaries.'" *Diduck v. Kaszycki & Sons,*

---

or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B).

29 U.S.C. § 1002(21)(A).

Contractors, Inc., 874 F.2d 912, 916 (2d Cir.1989) (quoting Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447, reh'g denied, 473 U.S. 926, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985)).

The objective of ERISA's fiduciary provisions was to make applicable the law of trusts and establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets and to provide effective remedies for breaches of trust. Thus, the intent of Congress was to federalize the common law of trusts applied in view of the special nature and purpose of employee benefit plans. See Freund v. Marshall & Ilsey Bank, 485 F.Supp. 629, 635 (W.D.Wis.1979). "At the heart of the fiduciary relationship is the duty of complete and undivided loyalty to the beneficiaries of the trust." Id. at 639.

■ A fundamental common-law duty of a trustee is to preserve and maintain trust assets. This includes "determin[ing] exactly what property forms the subject-matter of the trust [and] who are the beneficiaries." Central States, 472 U.S. at 572, 105 S.Ct. at 2841, quoting Bogert & Bogert, Law of Trusts and Trustees (2d rev'd ed. 1980), § 583 at 348. The trustee is expected to "use reasonable diligence to discover the location of the trust property and to take control of it without unnecessary delay." Id.

■ Although he was a trustee of the funds, John Senyshyn breached his fiduciary duty by submitting false shop steward reports which omitted the Polish workers, resulting in the Funds' being unable to ascertain and collect the full amount of contributions due.[17] After submitting the false reports, he took no actions to assure that the Funds received all the contributions. Indeed, he remained silent at meetings of the Funds' trustees, and he did nothing to inform John Osijuk, his successor as shop steward, that not all workers had been listed on his shop steward reports. Nor did he take any action to determine whether the shop steward reports submitted by Osijuk accurately represented the workers on the job.

### The Breach of Fiduciary Duty Involved Fraud or Concealment

Fraud consists of 1) an untrue representation, 2) knowledge of or reckless disregard for its falsity, 3) intention to induce reliance, and 4) another party's acting or refraining from acting because of it, 5) resulting in damage. 37 Am.Jur.2d, Fraud and Deceit § 12; 37 C.J.S., Fraud and Deceit, § 83; cf. Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987) (elements of common law fraud are material, false representation, an intent to defraud thereby, and reasonable reliance on the representation).

■ These elements are met here. Senyshyn submitted shop steward reports which he knew did not truthfully represent the workers on the job. He intended to mislead the administrators of the funds as to the number of workers on the Kaszycki job for whom contributions were due. Because of the false shop steward reports (as well as the false employer reports), the fund administrators and trustees refrained from seeking contributions on behalf of the wages of the Polish workers. The funds suffered damages due to the underpayment of contributions.

Senyshyn argues that the shop steward reports were not relied upon by the funds' administrators. We disagree. The shop steward reports were the union's only source of information about the workers on

---

17. We note that the Second Circuit's opinion in this case assumes that contributions were due on the wages of the Polish, non-union workers as well as on the wages of the union workers. That court held that "the Trustees breached their fiduciary duty by limiting their threatened work stoppages to collecting delinquent contributions for union workers and by failing even to investigate a possible lawsuit against the Trump defendants to recover the delinquent contributions for the non-union workers." Diduck v. Kaszycki, 874 F.2d at 917. We agree that the contract required contributions on the wages of all workers doing work covered by the contract. Since the Polish workers were undoubtedly doing demolition work as defined in the contract, contributions were due on their wages as well as on the union members' wages.

the job site independent of the employer's payroll reports. It is true as Senyshyn points out that the funds' administrators used the employer's report for earnings information when there were minor discrepancies that favored the fund. Nevertheless, this use of the employer's report does not preclude the fact that the administrators relied on the shop steward reports for notice to alert them of precisely the situation which existed on the Kaszycki job, namely, a sizeable group of nonunion people working at substandard wages and conditions, doing work covered by the contract and for whose wages contributions were due. There can be only speculation as to how the administrators would have acted had they received the proper notice by a truthful shop steward's report. Senyshyn's false reports prevented the trustees from taking any action at all since they had no notice. Further, we note the following notation in the minutes of the trustees' meeting for both the pension and insurance fund for October 20, 1980 under the heading "Delinquent Accounts":

. . . .

(b) *Kaszycki & Sons*—Mr. Tvert will check the shop steward's report against the money contributed to see if there are any discrepancies.

Pltf's Exh. 108 at 232a, 234a. Thus, the shop steward's report was relied upon at a later stage of the process than in the initial billing of the employer for contributions.

■ Senyshyn also argues that plaintiff has failed to prove that any fraud was perpetrated with respect to the period preceding Senyshyn's employment at the Bonwit Teller site. Senyshyn's Post-Trial Brief at 49. First, there is evidence that some time before January 29, 1980 Senyshyn knew that Kaszycki intended to employ non-union labor on the Bonwit Teller job. Kaszycki testified that he talked to Senyshyn and Mike Novak even before he signed the contract with Trump–Equitable on January 29, 1980. Tr. 619. More importantly, in our Amended Order dated June 29, 1990 we ruled in this case that the terms of the Collective Bargaining Agreement with Local 95 stating its effective dates could not be varied by introduction of extrinsic evidence. *See Diduck v. Kaszycki*, No. 83 Civ. 6346 (June 29, 1990) at 6. Accordingly, it is by applying the terms of the collective bargaining agreement that Senyshyn's liability for failure to collect contributions includes the period from the start of the work on the Bonwit Teller job.

*Trump–Equitable Participated in the Breach*

■ The elements of a knowing participation in a fiduciary breach are the following: 1) an act or omission which furthers or completes the breach, and 2) actual or constructive knowledge at the time that the transaction amounted to a breach, or the legal equivalent of such knowledge. *Donovan v. Schmoutey*, 592 F.Supp. 1361, 1396 (D.Nev.1984). There is no element of intent to be proved in connection with a claim of knowing participation in a fiduciary breach. *Id.* The common law of trusts imposes particular duties and obligations on parties which deal with trusts, including the exercise of good faith toward the beneficiaries of the trust and a duty of inquiry. *Id.*, citing 76 Am.Jur.2d *Trusts*, § 309 at 529 (1975); *see also S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 848–49 (2d Cir. 1987) (gravamen of claim of participation in a fiduciary's breach of duty is "knowing participation"; it does not require proof of intent to harm).

■ Macari, the vice-president of Trump–Equitable and the person in charge of the Bonwit Teller demolition, knowingly participated in John Senyshyn's breach of fiduciary duty. Macari was involved in every aspect of the demolition job. He knew the Polish workers were working "off the books," that they were doing demolition work, that they were non-union, that they were paid substandard wages with no overtime pay, and that they were paid irregularly if at all. More importantly, he knew of John Senyshyn's role in the union and knew when he complied with Senyshyn's request for contributions that the request was based only on the wages of union workers.

Macari knew or should have known that contributions were due for the wages of the Polish workers. Macari was familiar with management of construction projects and he was familiar with the role of union and non-union labor on a union job. Moreover, he carefully checked the list of employees on the employer's report before authorizing Trump–Equitable to make contributions to the Funds. Macari knew that the employer's report was only a partial list of the workers on the job. Accordingly, Trump–Equitable knowingly participated in Senyshyn's breach of fiduciary duty.

 The theory of a knowing participation in a breach of fiduciary duty is related to an allegation of conspiracy. Plaintiff argues that conspiracy is established by showing a common action for a common purpose by common agreement or understanding among a group, from which common responsibility derives. *Newburger, Loeb & Co. Inc. v. Gross,* 563 F.2d 1057, 1074 (2d Cir.1977). The element of agreement is a key distinguishing factor in a civil conspiracy action. *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.1983). Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement. *Id.* A court may infer an agreement; in doing so it may consider relevant evidence such as the relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity) as well as other significant factors in individual cases.

 Applying these principles to the facts of this case, we find that a conspiracy to deprive the funds of their rightful contributions has been shown. While there is insufficient evidence to establish an explicit understanding among the parties, there is strong evidence of tacit agreement by the parties (Kaszycki, Senyshyn, and the Trump defendants) to employ the Polish workers and to deprive them of the benefits ordinarily accorded to non-union workers on a union job, including contributions to the funds based on their wages. For example, it is not mere coincidence that the employer's reports and the shop steward reports omitted the Polish workers, who constituted more than a few workers on the job. Further, Kaszycki admitted that he talked to Senyshyn before he signed the contract with Trump–Equitable. Finally, as noted above, the evidence shows that Macari knew that the Polish workers were doing demolition work covered by the contract and yet participated in shortchanging the funds of the contributions due them.

*Damages*

 The liability of a knowing participant in a fiduciary breach is joint and several with the breaching fiduciary. *Donovan v. Schmoutey,* 592 F.Supp. at 1396; *cf. Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1220 (2d Cir.1987) ("parties who knowingly participate in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries."). Thus, the extent of the Trump defendants' liability is determined by the extent of Senyshyn's liability. *See Dardaganis v. Grace Capital, Inc.,* 664 F.Supp. 105, 110 (S.D.N.Y.1987), *aff'd in part, vacated in part,* 889 F.2d 1237 (2d Cir.1989).

Senyshyn's liability for breach of fiduciary duty is defined in ERISA as follows:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate....

29 U.S.C. § 1109(a).

Neither Kaszycki nor Trump–Equitable kept records regarding the Polish workers. The best and most reliable evidence as to the number of hours worked is the data collected in the investigation conducted by the United States Labor Department in *Donovan v. Kaszycki & Sons, Contractors, Inc.,* 599 F.Supp. 860 (S.D.N.Y.1984).

Accordingly, those findings are the best evidence for the computation of damages.

## CONCLUSION

We find for the plaintiff. We hold that John Senyshyn breached his fiduciary duty and that Trump–Equitable participated in the breach.

Plaintiff shall submit a judgment.

SO ORDERED.

## SUPPLEMENTAL DECISION

STEWART, District Judge:

This Supplemental Memorandum Decision adds to our Memorandum Decision dated April 24, 1991 ("the April 24th Decision"). In the April 24th Decision we found that the damages should be computed based on the data collected in the investigation conducted by the United States Labor Department in *Donovan v. Kaszycki & Sons, Contractors, Inc.*, 599 F.Supp. 860 (S.D.N.Y.1984). Using these figures, we agree with the plaintiff that the amount of contributions which should have been made in 1980 on the wages of the Polish workers totals $325,415.84.

### Double Interest

■■■■ In a civil action brought by a participant or beneficiary ERISA allows the redress of violations of the Act and "other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). Plaintiff argues that the funds should be awarded "double interest" on the delinquent contributions as part of the general damages for which defendants are liable as a result of their breach. We disagree. In a pretrial Order dated May 29, 1990 we ruled that section 409 of ERISA, 29 U.S.C. § 1109, does not encompass the double interest liquidated damages provision of section 502(g)(2) of the Act, 29 U.S.C. § 1132(g)(2). We noted that the provisions of section 502(g)(2) apply only to actions by fiduciaries who bring an action to collect delinquent contributions. *See Diduck v. Kaszycki*, 83 Civ. 6346 (May 29, 1990) at 2. We affirm our previous holding.

### Contractual Damages

■■■■ Plaintiff next argues that he is entitled to contractual damages of fifteen per cent of the delinquent contributions. Under the collective bargaining agreement of Local 95, if an employer fails to fulfill its obligations to the funds, the funds may collect from the employer the sum of $100 for the first breach and $250 for the second breach, or fifteen percent of the amount owed, whichever is greater. Pltf's Exh. 1 ¶ 35(b). However, the collective bargaining agreement language clearly states that these damages are to be collected from the employer. This is an action for breach of fiduciary duty by Senyshyn, a union fund trustee. He breached his fiduciary duty by failing to ensure that the funds received all the contributions that were due. The Trump defendants are liable because we find that they knowingly participated in that breach, not because we find they were the employer.[1] Accordingly, we deny the award of damages under the contract.

### Interest

■■■■ Plaintiff contends that he should be awarded interest on the contributions at the rates provided in 26 U.S.C. § 6621. We agree.

■■■■ ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest. This discretion includes "the power to award interest at a rate that will put the [Pension Fund] in the position that it would have had but for the [trustees'] breach." *McLaughlin v. Cohen*, 686 F.Supp. 454, 458 (S.D.N.Y.1988), (citing *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.1984), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83

---

1. Defendant Senyshyn argues that the funds suffered no damages because it has not been found that the Trump defendants had a legal obligation to make contributions to the funds. Once again we emphasize that the Trump defen-

dants' liability stems from our finding that they participated in the fiduciary breach. We do not rule on the question of whether they were employers or that they had a legal obligation to make contributions.

---

L.Ed.2d 506 (1984)). In exercising this discretion, courts have relied on the adjusted prime interest rates set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621 as a fair measure of the cost of money over the relevant time period. *See McLaughlin,* 686 F.Supp. at 458 and cases cited therein. Accordingly, plaintiff is awarded interest on the contributions at the rate set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621 calculated from April 1, 1980.

### Attorney's Fees

ERISA allows the recovery of attorney's fees and costs in an action by a participant or beneficiary. 29 U.S.C. § 1132(g)(1). Five factors to be considered in the award of attorney's fees are the following: 1) the degree of the offending party's culpability or bad faith; 2) the ability of the offending party to satisfy an award of attorney's fees; 3) whether an award of fees would deter other persons from acting similarly under like circumstances; 4) the relative merits of the parties' positions; and 5) whether the action sought to confer a common benefit on a group of pension plan participants. *Miles v. New York State Teamsters Conference, etc.,* 698 F.2d 593, 602 n. 9 (2d Cir.1983), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983) (quoting *Ford v. New York Central Teamsters Pension Fund,* 506 F.Supp. 180, 183 (W.D.N.Y.1980) (Elfvin, J.), *aff'd,* 642 F.2d 664 (2d Cir.1981)); *see also Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 872 (2d Cir.1987).

All of the above criteria are met in this case. Senyshyn's breach involved fraud and the Trump defendants knowingly participated in his breach. Because we have found joint and several liability by the defendants, we expect that the award can be satisfied. We expect there will be a deterrent effect on the behavior of the fiduciaries of at least this union and perhaps others as well and that the deterrence will extend to those who are tempted to assist and participate in an obvious breach of fiduciary duty. Finally, the plaintiff has prevailed on behalf of the participants and beneficiaries of the pension and welfare funds. Accordingly, attorney's fees and costs are awarded to the plaintiff.

### CONCLUSION

In sum, plaintiff is awarded the following:

1) unpaid contributions in the amount of $325,415.84;

2) interest from April 1, 1980 calculated at the rate of interest set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621; and

3) attorney's fees and costs.

Plaintiff shall submit a judgment.

SO ORDERED.