**CHATEAU DE VILLE PRODUCTIONS, INC., Westbury Music Fair, Inc., Connecticut Performing Arts Foundation, Inc., and Delta D. & I. Corp., Plaintiffs,**

v.

**TAMS–WITMARK MUSIC LIBRARY, INC., Defendant,**

and

**Music Fair Enterprises, Inc., Additional Defendant to Cross-claims.**

No. 76 Civ. 2788 (KTD).

United States District Court,
S. D. New York.

July 7, 1979.

**224**

Blumenthal & Lynne, and Solin & Breindel, New York City, for plaintiffs.

Wachtell, Lipton, Rosen & Katz, New York City, for defendant Tams-Witmark Music Library, Inc.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiffs, owners and operators of dinner theatres, stock theatres and musical playhouses, filed this action in June, 1976 charging defendant Tams-Witmark Music Library, Inc. [hereinafter referred to as "Tams-Witmark"] with violations of the antitrust laws. Defendant has now moved for an order disqualifying plaintiffs' counsel on the grounds that a conflict exists because of such counsel's simultaneous representation of plaintiffs and a "co-conspirator" in the alleged antitrust violations.

Tams-Witmark is engaged in the business of licensing professional theatres to present stage presentations of musical plays on behalf of the copyright owners and controllers of the performance rights to such plays. Pursuant to contracts with these copyright owners, royalties are collected by Tams-Witmark and remitted to them. Plaintiffs, who proceed on their own behalf and seek to proceed on behalf of similarly situated professional theatres,[1] charge that Tams-Witmark has conspired with the owners and controllers of the performance rights in musical plays to monopolize the licensing of musicals, to illegally fix fees and to unlawfully tie-in licenses with a requirement that music and textual material be rented from Tams-Witmark. Plaintiffs seek treble damages, an injunction against Tams-Witmark's allegedly illegal activities, a declaratory judgment declaring illegal and voiding Tams-Witmark's exclusive contracts with any owner of a musical and a dissolution of Tams-Witmark. Tams-Witmark has filed counterclaims against two of the named plaintiffs for alleged violations of their contracts with it. Tams-Witmark also sought and was given leave to join Music Fair Enterprises, Inc., the parent corporation of Westbury Music Fair, Inc., a named plaintiff herein, as an additional defendant to its cross-claims. Music Fair was the actual party to the licensing agreements with Tams-Witmark under which performances at Westbury Music Fair were permitted.

The instant motion for disqualification is based upon facts regarding Music Fair that have apparently only recently come to defendant's attention. According to plaintiffs' complaint, Tams-Witmark owns or controls the rights to an extensive number of musical plays. One of these musicals is a

1. The class is not presently certified.

comedy entitled "Lorelei." Tams-Witmark has an agreement with the holders of the performance rights to Lorelei pursuant to which Tams-Witmark may license professional stock performances of Lorelei and must remit 40% of the net royalties it collects to The Lorelei Company, a limited partnership which is the producer of the play. Until recently, Tams-Witmark believed that the principals of The Lorelei Company, Leon Guber and Sheldon Gross, who are also officers, directors and principal stockholders of Music Fair, were involved in The Lorelei Company in their individual capacities only. Affidavit of Louis H. Aborn, ¶ 5, March 8, 1979. It now appears that Music Fair itself is a general partner in the limited partnership which formed The Lorelei Company and, according to its 1973 Form 10–k registration statement, was to receive 43.75% of any net profits, as well as one percent of the gross weekly box office receipts. The 1972 Offering Circular filed with Form 10–k provided that Music Fair may "[b]e associated as producer, director, or in any other capacity with the purchaser of subsidiary rights in [Lorelei] and retain any direct or indirect compensation paid for services as such." The Offering Circular also provided that upon the author's sale of its subsidiary rights, The Lorelei Company would retain a 40% interest in the net receipts therefrom

> if such rights are disposed of during the first 10 years after the close of the last first-class run of the Play and [such interest] decreases to nothing if such rights are disposed of during the next 8 years.

Exhibit G, Aborn Affidavit, March 8, 1979.

In 1974 Tams-Witmark entered into its agreement with the copyright owners of Lorelei. As indicated above by virtue of this agreement and a letter agreement between Tams-Witmark and The Lorelei Company, Tams-Witmark is to remit to The Lorelei Company 40% of the royalties it collects. In the letter agreement dated November 21, 1974, The Lorelei Company expressly consented to the license agreement and granted Tams-Witmark the right to use "the direction, ideas, stage business and choreography as used in the Broadway production." Exhibit A, Aborn Affidavit, April 9, 1979. It appears that Tams-Witmark paid The Lorelei Company $20,000 in consideration of its approval of the licensing agreement.

Music Fair is represented in this action by the same counsel which represents plaintiffs and the purported class. Since under the facts as developed above, Music Fair would have to be considered a co-conspirator with Tams-Witmark, the latter argues that a glaring conflict exists in violation of Canon 5, ABA Code of Professional Responsibility.[2]

█ The ABA Code of Professional Responsibility sets forth nine guiding principles of professional conduct. One of these basic tenets is that an attorney owes his client the duty of unimpaired loyalty. Thus, where a conflict of interest exists, as for example where the same attorney seeks to represent more than one client with adverse or potentially adverse concerns, disqualification will be required unless the attorney can show "that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Cinema 5, Ltd. v. Cinerama*, 528 F.2d 1384, 1387 (2d Cir. 1976); *Estates Theatres, Inc. v. Columbia Pictures Industries, Inc.*, 345 F.Supp. 93 (S.D.N.Y.1972). It is also necessary, however, when considering a disqualification motion, to be mindful of the recent spate of such motions and their use as " 'tools of the litigation process.' " *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977) (citation omitted). Our Court of Appeals has adopted a cautious approach to questions of disqualification, examining the problems sought to be met by the Code, the reality of those problems in practice and " 'whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more

---

2. Canon 5 provides
    A lawyer should exercise independent professional judgment on behalf of a client.

harm than good, by requiring the client and the judicial system to sacrifice more than the value of the presumed benefits.'" *International Electronics Corp. v. Flanzer,* 527 F.2d 1288 (2d Cir. 1975).

My concerns in this case are compounded by the fact that counsel for plaintiffs seek to represent a class and are thus obliged to exercise their fiduciary obligations with particular care. *See generally Greenfield v. Villager Industries, Inc.,* 483 F.2d 824 (3d Cir. 1973). Because the proposed class members are absentees without an opportunity to partake in the proceedings, it is of paramount importance that their rights and interests be closely safeguarded. In a class action, even the appearance of divided loyalties should be avoided. *Sullivan v. Chase Investment Services of Boston, Inc.,* 79 F.R.D. 246 (N.D. Cal.1978).

With all these considerations in mind, I turn to the instant motion. The issue before me is whether counsel for plaintiffs and a potential class may simultaneously represent one of defendant's co-conspirators in an antitrust action which seeks to nullify contracts between the co-conspirators. When so stated, I believe the answer becomes clear; such multiple representation is inappropriate. Permitting plaintiffs' counsel to proceed in this manner would expose them to competing influences and loyalties. Moreover, even if, as plaintiffs assert, no glaring conflict exists at this time, when adverse interests are at stake it is not possible to predict what conflicts might arise as the litigation proceeds. It is better to forestall such a potential danger early in the litigation than to wait until the parties are deep in the discovery process.[3]

Coupled with this potential exposure to competing influences is the appearance of impropriety that follows from multiple representation in a case like this. If permitted to proceed, plaintiffs' counsel would have to bear two standards: one as champion of the class and the other as protector of Music Fair's integrity as a co-conspirator. Canon 9 provides that "a lawyer should avoid even the appearance of professional impropriety." Compliance with this tenet mandates that counsel be disqualified from representing both plaintiffs and Music Fair in the instant action.

It should be noted that plaintiffs do not dispute the basic facts underlying the joint representation. They do, however, denigrate their importance. In the first place, they argue that Music Fair did not control the granting of Lorelei performance rights by its authors to Tams-Witmark. However, even assuming the truth of this assertion,[4] it does not vitiate the conflict that exists between a royalty recipient and the plaintiffs charging that such royalties are illegally collected. Nor does the representation that the royalties are "de minimis" detract from the basic proposition that where a conflict exists "the law will not inquire into the force of the impact or its potential damage." *Estates Theatres, supra* at 98. Plaintiffs also argue that the interests of plaintiffs and Music Fair are identical and thus joint representation is permissible. *See Brown & Williamson Tobacco Corp. v. Daniel International Corp.,* 563 F.2d 671 (5th Cir. 1977). Unfortunately, plaintiffs make no effort to explain this so-called "identify of interest" and, other than the fact that Westbury Music Fair, a named plaintiff, is a wholly owned subsidiary of Music Fair, there appears to be no such identity. There are four other named plaintiffs and a host of potential class members and I have no reason to presume that they have anything in common with Music Fair.

The final contention in opposition to disqualification is that plaintiffs and Music Fair have consented to the use of the same counsel. This representation made in counsel's affidavit is hardly sufficient to

**3.** Although this action was filed in 1976, almost no discovery has taken place and as indicated in fn.1, *supra,* no class is presently certified.

**4.** The letter agreement wherein The Lorelei Company consented to the licensing agreement places this assertion in doubt. Exhibit A, Aborn Affidavit, March 8, 1979.

constitute consent. *See generally Rice v. Baron,* 456 F.Supp. 1361, 1376 (S.D.N.Y. 1978).[5] Moreover, since plaintiffs still seek to proceed on behalf of a class, the consent of all would be required and this, of course, is not a practical possibility. Lastly, even if consent were acquired, it is doubtful whether it would suffice to cure the conflict since I do not believe it "obvious that [the same counsel] can adequately represent the interest of each" of the multiple clients. ABA Code of Professional Responsibility, DR 5–105(C).

The question left for my consideration is whether counsel must be disqualified from representing both plaintiffs and Music Fair, or whether they will be permitted to continue on behalf of one of these parties. Defendant contends that they may not represent any one in this action for to do so would condone a violation of Canon 4 which provides that "a lawyer should preserve the confidences and secrets of a client." Defendant relies upon cases which for the most part involve situations where an attorney seeks to represent an interest adverse to that of a former client in an action brought against that former client. *See, e. g., Government of India v. Cook Industries,* 569 F.2d 737 (2d Cir. 1978); *NCK Organization Ltd. v. Bregman,* 542 F.2d 128 (2d Cir. 1976); *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir. 1973). *See also Hull v. Celanese Corporation,* 513 F.2d 568 (2d Cir. 1975) where in-house counsel for defendant sought to become a plaintiff in an action against defendant although she had worked on the very same action on defendant's behalf. In those cases, the defendants would have had their own confidences betrayed by the proposed representation. By contrast, in the case at bar, Tams-Witmark has no similar interest to protect. Nor do I believe that permitting counsel to continue representing one of the parties would create the appearance of impropriety since they will be obligated to sever all ties with the other if they are to do so.

Counsel has expressed a desire, if a choice must be made, to continue representing plaintiffs. This choice does not, of course, bind the Court. *Estate Theatres, supra* at 100. However, after careful consideration, I believe that it is, in fact, appropriate for counsel to proceed on behalf of plaintiffs and not Music Fair. Although this lawsuit has not moved rapidly along the discovery stages, it has generated a great deal of paper work and with it, presumably, an intimate familiarity with the case. This familiarity should not be lightly disregarded, particularly if this action does proceed on behalf of a class of plaintiffs. *See generally Sullivan v. Chase Investment Services of Boston, supra.* The hardship to Music Fair resulting from the disqualification of its counsel is not as apparent. Indeed, insofar as the aforementioned conflict is concerned, Music Fair is not a named party. Although it is a defendant as to contractual cross-claims and an antitrust suit brought by Tams-Witmark and consolidated herewith,[6] I do not believe it will be difficult for Music Fair to retain counsel to defend these claims. Accordingly, Music Fair is directed to retain new counsel and counsel for plaintiffs are directed to submit an affidavit certifying that they have completely withdrawn from further representation of Music Fair and will not represent it again during the pendency of these actions.

It is SO ORDERED.

---

**5.** Although Leon Guber, Vice President of Music Fair, in an affidavit expresses a desire to have present counsel continue, it is unclear whether he does so as a representative of Music Fair or Westbury Music Fair. In any event, there are four other named plaintiff as to whom consents are not even arguably executed.

**6.** *Tams-Witmark v. Musical Theatres Ass'n, et al.,* 77 Civ. 3025.