Fernando MOLINA, et al., Plaintiffs,

v.

The MALLAH ORGANIZATION,
INC., et al., Defendants.

No. 91 CIV 1575 (WK).

United States District Court,
S.D. New York.

March 5, 1992.

On Motion For Reargument April 9, 1992.

Celia Goldwag Barenholtz, Alan Levine, Kronish, Lieb, Weiner & Hellman, New York City, for plaintiffs.

Bettina B. Plevan, Proskauer Rose Goetz & Mendelsohn, New York City, for defendants Mallah Organization, et al., Carryl Mallah, Sheldon Mallah, Joel Mallah.

S. David Harrison, Lesser & Harrison, New York City, for defendant Rapid Park.

David F. Jasinski, Jasinski and Bisceglie, Newark, N.J., for defendants Rapid Park Industries, Inc., et al., Elizabeth Parking Co., Kevin Wolfe, Raymond Wolfe.

Neal Platt, Shwal & Platt, New York City, for defendants Manhattan Parking, et al.

James LaRossa, LaRossa Mitchell & Ross, New York City, for defendants Martin Meyers, Mack Parking, Carole Storage Corp., and Manhattan Parking Systems Corp.

Richard H. Maidman, New York City, for defendant Samuel Lipman.

Elizer Cohen, New York City, for defendant Manhattan Parking E. 12th Street Corp.

Brian D. Sullivan, Lord Day & Lord, Barret Smith, New York City, for nominal defendants Mac Victor, Simon Rogove, Bernard Ratshin, Daniel Stark, Milton Lewin, Brad Shey, and Norman Goodfarb.

Fred S. Sommer, Arent Fox Kintner Plotkin & Kahn, Washington, D.C., C. Stephen Heard, Jr., McGarrahan & Heard, New York City, for intervenor Metropolitan Garage Owners Ass'n, Inc.

## OPINION AND ORDER

WHITMAN KNAPP, District Judge.

Plaintiffs bring suit directly and derivatively alleging violations of ERISA, 29 U.S.C. §§ 1132(g)(2), 1132(a)(3), 1140, and 1145, and the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), alleging that they were injured by defendants' failure to make contributions for them to the Local 272 Welfare Fund and to the Local 272 Pension Fund ("the Funds") and by the denial of their right to participate in those Funds. The Funds are multiemployer plans within ERISA, 29 U.S.C. §§ 1002(37)(A) and 1145, and the LMRA, 29 U.S.C. § 186(c)(5).

Plaintiffs are parking garage employees who now work or have previously worked for facilities owned and operated by the defendant parking garages. There are three categories of defendants: the employers, consisting of parking garages owned and operated by the Mallah, Rapid Park, and Manhattan Parking garage chains, and some of their shareholders, officers, and/or agents; the "Nominal defendants," five present and two former employer trustees of the Funds; and individual defendants Samuel Lipman and Manhattan Parking East 12th Street Corp. Metropolitan Garage Owners Association ("MGOA"), which is the collective bargaining agent for garages that belong to it, has intervened in the action. The Mallah chain, especially, and the nominal defendants have taken the lead for all defendants in litigating this matter. Thus while we refer almost exclusively to "Mallah" and the nominal defendants when discussing the motions before us, we incorporate the other defendants to the extent that they have joined the Mallah or nominal defendants motions and memoranda.

Before us are a number of interrelated motions. First, Mallah moves under Fed. Rule Civ.Pro. 12(b): (i) to dismiss the com-

plaint for failure to join plaintiffs' union, Garage Employees Local Union 272 ("the Union"), as an indispensable party, failure to exhaust grievance procedures under the collective bargaining agreement between the Union and defendant-intervenor MGOA, and failure to exhaust internal plan remedies; (ii) to dismiss Counts I, II, and III for failure to allege any facts establishing that the Funds' trustees breached their fiduciary duty, and failure to allege a proper demand upon the trustees; (iii) to dismiss Count IV for failure to state a claim; (iv) to dismiss all claims against the individual Mallah defendants for failure to state a claim upon which relief can be granted; and/or (v) to stay proceedings against the employer defendants.

The nominal defendants move to dismiss the complaint for failure to state a claim of breach of fiduciary duty against any of them and for failure to make an appropriate demand. They further request that, if appropriate, we treat their motion as one for summary judgment.

Defendants Rapid Park and Manhattan joined in both the Mallah and MGOA motions; defendants Samuel Lipman and Manhattan Parking East 12th Street made individual motions exactly tracking the Mallah motion and joined in the Mallah memorandum of law; and intervenor MGOA neither made nor joined in any motion. We heard oral argument on these motions on September 27, 1991, at which time we denied the Mallah motion insofar as it sought dismissal for failure to add the Union as an indispensable party.

The remaining outstanding motions, on which we have not heard oral argument, but which are all fully briefed, consist of:

plaintiff's motion for class certification [1]; the Mallah motion to disqualify plaintiffs' counsel, the firm of Kronish, Lieb, Weiner & Hellman; and intervenor MGOA's motion to join Local 272 as a party to the action. The non-moving defendants join in the motions made by MGOA and Mallah, as well as Mallah's opposition to plaintiffs' motion for class certification.

For the reasons that follow, we grant in part and deny in part Mallah's motion to dismiss. We deny the nominal defendants' motion to dismiss and decline to address it as one for summary judgment. Mallah's motion to disqualify Kronish, Lieb from simultaneously representing plaintiffs, the Union, and the Union trustees as counsel is granted on the specific terms set forth below. Finally, we reserve decision on MGOA's motion to join the Union and plaintiff's motion for class certification pending a resolution among plaintiffs, the Union, and the Kronish firm with respect to who will represent whom.

## BACKGROUND [2]

Three successive three-year collective agreements dated February 6, 1983, 1986, and 1989 between MGOA and the Union—who are the sole collective bargaining representatives for their respective members—govern the terms of employment between garage employees and the individual employing garages who are members of MGOA. These collective agreements provide, *inter alia*, that: the agreements are binding on all members of MGOA; the corporate veil may be pierced; the agreements apply to all "covered employees," which category includes "working managers or working foremen, washers, floormen, transporters and cashiers" and any

1. The proposed class is all persons entitled to participate in the Funds who were employed by defendants in covered employment but for whom contributions to the Funds were not made, and all persons related to these plaintiffs who were thus also beneficiaries of the Funds. Plaintiffs also seek certification of three subclasses of persons for whose benefit Mallah, Rapid Park, and Manhattan Parking should have made contributions to the Funds.

2. When entertaining a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.Rule Civ.Pro.

12(b)(6)—which, having denied Mallah's motion to dismiss for failure to join a necessary party is essentially all that remains of the initial Mallah and nominal defendants motions—we are required to "accept the material facts alleged in the complaint as true," *Branum v. Clark*, (2d Cir.1991) 927 F.2d 698, 705; *see also Cooper v. Pate*, (1964) 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030, *Dwyer v. Regan* (2d Cir.1985) 777 F.2d 825, *modified on other grounds* 793 F.2d 457 (1986). Thus the facts related in this section are drawn solely from the complaint.

person whose "duties include parking cars"; "all covered employees [are to] become members of Local 272 after 30 days of work"; and contributions to the Funds are to be made according to an agreed-upon schedule for all covered employees who have worked a specified period. Compl. at ¶¶ 160, 162–66.

Despite these contractual obligations, defendants, as early as 1981, hit upon a scheme that has ended up defrauding the Funds of more than $6.7 million. The structure of this scheme was quite simple: defendants hired plaintiffs and at least 470 fellow members of their proposed class—many of whom were newly arrived illegal aliens fearful for their immigration status—as garage employees in covered employment, but neither caused them to join the Union within 30 days, nor made Funds contributions for them. Compl. at ¶¶ 18(a), 6. Defendants used a variety of means to implement the scheme, including hiding the existence of the Union, actively discouraging union membership when employees became aware of it, implicitly and explicitly threatening discharge should employees attempt to join the Union, concealing from the Union and from the Funds' auditors the existence of those employees whom defendants sought to exclude from union membership by transferring them from one garage to another, paying these hidden employees through a "web" of corporate entities, and actually (in at least one case) paying an employee's medical expenses to discourage his joining the Union. They also threatened to retaliate against any employees who assisted Union delegates in this action. Finally, defendants deliberately hid the identity of these employees from the Funds by failing to report them on the monthly Employer Report Form used by the Funds to track contribution levels and employees' eligibility for benefits from the Welfare Fund and vesting status in the

Pension Fund. Compl. at ¶¶ 173, 178–80. The Employer Report Form states that "[a]ll employees in jobs covered by the Collective Bargaining Agreement with Local 272 must be paid for whether or not they are Union Members." Compl. at ¶ 169.

The agreement that was entered into on February 6, 1989 and expired on February 5, 1992 ("1989 Agreement") created for the first time two classes of "A" and "B" level employees, for each of which separate wage scales and contribution requirements applied.[3] The "A" level employees are those current workers for whom Funds contributions were made in the 36 months preceding the 1989 contract, while the "B" level employees are those current workers for whom no Funds contributions had been made in the preceding 36 months and all workers hired after the 1989 agreement became effective for whom no Funds contributions had previously been made. No Funds contributions need be made for "B" workers during their first year of employ, and their wages and benefits are lower than those of "A" workers. Compl. at ¶¶ 7–8, 182–186.

This agreement also signalled a shift in defendants' scheme. In expressly creating and defining two classes of workers, the agreement also recognized that the new "B" class consisted of employees who had had a right to participate in the Funds, which right defendants had denied, and for whom contributions to the Funds should have been made, but had not been. MGOA issued a bulletin on or about the effective date of the 1989 Agreement instructing all "B" workers—those "present employees" working in covered employment "for whom no Pension Fund contributions have been made"—to join the Union by April 1, 1989. Thus after this agreement identified a class of workers whom defendants had denied

---

**3.** Defendants claim that this arrangement was a *quid pro quo* deal between the Union and MGOA by which MGOA would abandon its claims that the "B" workers were not in fact "covered" workers and promptly enroll them in the plans, and the Union would give up any claims that these "B" workers should have been covered under the prior collective agreements. Stark

Aff. at ¶ 9. Needless to say this version of the contract negotiations is entirely absent from the complaint (and indeed the collective agreement itself); we therefore do not address it in assessing defendants' Fed.Rule Civ.Pro. 12(b)(6) motions, but confine our inquiry to the facts alleged in the complaint. *See supra* note 2.

participation in the Funds and for whom no contributions had been made, defendants began to act with respect to their previously hidden employees in a fashion the earlier agreements had always required: defendants caused the "B" employees to join the Union, began to report them on the Employer Report Forms, and began to make contributions for them to the Funds. Compl. at ¶¶ 187–89.

As mandated in the several collective agreements and Declarations of Trusts that created them, both Funds are jointly administered by a ten-person Board of Trustees consisting of five trustees appointed by the employers through MGOA and five trustees named by the Union. The Funds cannot initiate any legal proceedings without the concurrence of a majority of trustees from each camp. Compl. at ¶ 9.

The employer trustees have known at least since the most recent collective agreement became effective on February 6, 1989 that there existed a sizable class of employees for whom contributions to the Funds should have been made but were not, in that more than 1000 employees were added to the Funds' rolls after the effective date of the agreement, most of whom were "B" employees. Starting in or about September, 1990 the Union tried to determine the extent to which defendants had been hiding employees from both it and the Funds. Among other things, it interviewed individual "B" employees to discover when they began working as covered employees. Copies of the information gathered in these interviews—signed statements, W2 forms, pay stubs, etc.—were given to the Funds administrator beginning in or about mid-September 1990, and were thus available to all trustees of the Funds. Compl. at ¶¶ 22–26.

Based on this information, the union trustees twice—once on December 19, 1990 and once on February 22, 1991—formally moved that the Funds initiate an action to recover the unpaid contributions from defendants. The employer trustees unanimously opposed the December 19 motion and unanimously refused to vote on the February 22 one. The Funds were thus deadlocked on the issue of litigation. While trustees may arbitrate such a deadlock under the Trust Agreement, plan beneficiaries may not. Compl. at ¶¶ 27–31.

It is plaintiffs' position that the employer trustees' repeated refusal to take action despite their knowledge of defendants' failure to contribute to the Funds, combined with their inherent bias against doing so because of their alliance with MGOA as its appointees and either members or employees of its members, made futile any demand by plaintiffs that they bring this suit. Compl. at ¶¶ 32–33. Finally, plaintiffs assert that they will fairly represent the interests of all other similarly placed persons, and that this action is not designed to create jurisdiction before us that would not otherwise exist. Compl. at ¶¶ 34–35.

As a result of the foregoing, plaintiffs on March 6, 1991 instituted this four count action for equitable relief and damages.[4] Counts I and III are brought derivatively. Count I alleges violations of ERISA § 515, 29 U.S.C. § 1145[5] (hereinafter § 515) for failure to make contributions. In this count plaintiffs sue in the place of the trustees to vindicate the Funds' claims against defendants, seeking the remedies articulated in ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2)[6] (hereinafter § 502(g)(2)).

---

4. Plaintiffs also seek reasonable attorneys' fees, costs, and other appropriate relief on all counts.

5. Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

6. In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the

Count III similarly asserts a derivative action on behalf of the trustees for defendants' failure to make contributions required by the collective agreement, LMRA § 301(a), 29 U.S.C. § 185(a)[7] (hereinafter § 301(a)). Compl. at ¶¶ 194–202, 205–08. Under this count, plaintiffs seek the unpaid contributions plus interest and punitive damages.

Count II is a direct claim by plaintiffs against defendants for violations of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)[8] (hereinafter § 502(a)(3)), and seeks equitable relief in the form of an accounting and an injunction directing defendants to pay contributions owing. Compl. at ¶¶ 203–04. Count IV is a direct claim that alleges defendants' violations of ERISA § 510, 29 U.S.C. § 1140[9] (hereinafter § 510) by intentionally interfering with plaintiffs' protected rights under the Funds' plans, and seeks compensatory damages. Compl. at ¶¶ 209–14. No relief is sought from the nominal defendants for their breach of fiduciary duty, which must be alleged to give rise to the derivative claims.

## DISCUSSION

### I. The Motions to Dismiss the Complaint

In considering a 12(b)(6) motion, the "issue is not whether a plaintiff will prevail, but whether the claimant is entitled to offer evidence"; in so determining we draw inferences and construe allegations in favor of the pleader. *Scheuer v. Rhodes* (1974) 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90. Thus we may not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson* (1957) 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80. With these guidelines in mind, we turn to the complaint.

### A. Plaintiffs' Derivative Claims

The law is clear that plaintiffs as plan participants can "sue derivatively on behalf of the fund 'only if the plaintiff first establishes that the trustees breached their fiduciary duty.'" *Diduck v. Kaszycki & Sons Contractors, Inc.* (2d Cir.1989) 874 F.2d 912, 916 (*quoting Alfarone v. Bernie Wolff Constr. Corp.* (2d Cir.1986) 788 F.2d 76, 80). Further, a derivative suit cannot be brought unless plaintiffs comply with Fed.Rule Civ.Pro. 23.1, which requires that a demand—in this case on the trustees—be made for the actions desired or reasons given why such a demand would have been futile. *Diduck v. Kaszycki & Sons Contractors, Inc.* (S.D.N.Y.1990) 737 F.Supp. 792, 799–801.[10] The parties agree, as do

amount determined by the court under subparagraph (A),
   (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
   (E) such other legal or equitable relief as the court deems appropriate.
29 U.S.C. § 1132(g)(2).

7. Suits for violation of contracts between an employer and a labor organization ... may be brought in any district court. 29 U.S.C. § 185(a).

8. A civil action may be brought—
   (3) by a ... fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriated equitable relief (i) to redress such violations of (ii) to enforce any provisions of this subchapter or the terms of the plan.
29 U.S.C. § 1132(a)(3).

9. It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, ... or [§ 185 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or [§ 185 et seq.]. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information ... or is about to testify in any inquiry or proceeding relating to this chapter or [§ 185 et seq.] The provisions of [§ 502] shall be applicable in the enforcement of this section.
29 U.S.C. § 1140.

10. In *Diduck* the plaintiff's derivative suit alleged breach on the part of the fund trustees because they sought contributions only for the union employees that were demolishing the old Bonwit Teller building to make way for the Trump Tower, but not for the many, generally illegal, Polish employees. The Second Circuit agreed with the district court that the trustees' refusal to sue after having considered such an

we, that the same standards and requirements pertain to derivative actions brought under ERISA or the LMRA.

Plaintiffs here allege a pattern of behavior on the part of the nominal defendants (who are the employer trustees of the Funds) that is more intricate than a mere refusal to sue derelict employers for unpaid contributions. They first claim that the 1989 agreement's creating a class of workers for whom contributions had not been paid, followed by the influx of more than 1000 of these "B" workers in the year after it was signed, in itself did or should have alerted the trustees to the fact that some employers had not been paying contributions for all of their workers. By September 1990, the contents of the Union's interviews with these "B" employees and other documentation that many of them had worked in a defendant's garage for a long time was in place in the Funds office and available to all trustees. The union trustees, based on this information, twice formally moved to have the Funds institute a suit to recover unpaid contributions for these workers; the employer trustees unanimously opposed the first of these demands and unanimously refused to vote on the second. Finally, plaintiffs allege that these refusals to act, as well as their alliance with MGOA, which gives them an inherent bias against exposing its members to liability for the unpaid contributions, would have rendered futile any similar demand by them.

■ These allegations are sufficiently specific and extensive that we cannot say as a matter of law that plaintiffs would be unable to make out either their claim of fiduciary breach or to establish the futility of making a demand upon the trustees.[11] Additionally, the trustees would have no obligation to arbitrate the issue of unpaid contributions with employers before bring suit. *See Schneider Moving & Storage Co. v. Robbins* (1984) 466 U.S. 364, 372, 104 S.Ct. 1844, 1849, 80 L.Ed.2d 366. Since plaintiffs seek to sue in the place of the trustees, they likewise have no obligation to arbitrate or exhaust any plan remedies. *See Struble v. N.J. Brewery Emp. Welfare Trust Fund* (3rd Cir.1984) 732 F.2d 325, 339 ("plaintiffs, as derivative claimants, need not exhaust their remedies under the bargaining agreements").[12] We therefore deny the motions to dismiss Counts I and III of the complaint.

### B. Plaintiffs' Direct Claims
#### 1. Count II

■ Plaintiffs' Count II alleges a direct claim for the unpaid contributions and an

action and having rejected it as a less productive measure than threatening work stoppages, was not a fiduciary breach; on the other hand, the trustees' failure, *inter alia*, even to consider suing the building's developer did constitute such a breach. *Diduck*, 874 F.2d at 917–18. However, this same failure even to consider taking action undermined plaintiff's claim that a demand to sue the developer would have been futile: if the trustees did not even consider acting, such a demand could not be found futile. *Diduck*, 737 F.Supp. at 802.

**11.** Defendants' argument that the 1989 contract creating the "B" workers and setting a schedule for making contributions for them was a *quid pro quo* for forgiving past unpaid contributions would (even if it could be found within the four corners of the complaint, *cf. supra* note 3) be unavailing. In the first place, defendants do not explain how any of the contracting parties could have released—by *quid pro quo* or otherwise—the claim of a plaintiff with whom they had no relationship whatsoever. Beyond that, having considered the contract insofar as the complaint incorporated it, we have found it to contain no language to support any such claim.

**12.** Although the Union is providing financial support for this suit, and the litigation is being pursued at the same time the collective bargaining agreement is being renegotiated, we cannot say that the Union is an actual party in interest in this case—especially in light of our decision to disqualify plaintiffs' counsel from simultaneously representing plaintiffs, the Union, and the union trustees, in part because of potentially conflicting interests among those groups. *See infra*. Nor can we conclude on the basis of the 1989 collective agreement that, *inter alia*, created a class of "B" "covered employees," that these same workers were not "covered employees" before the agreement took force. Therefore, we do not follow *Viggiano v. Shenango China Div. of Anchor Hocking* (3rd Cir.1984) 750 F.2d 276, in which the Third Circuit—having held that the union, a signatory to the collective agreement, was the actual party in interest and must follow the agreement's arbitration provisions—stayed a § 502 action so that the meaning of key contract terms—whether the contract established a duty

accounting pursuant to ERISA § 502(a)(3), which section provides for equitable relief only. *See Alfarone* 788 F.2d at 79 (affirming dismissal of § 502(a)(3) claim because plaintiff did "not assert a claim for injunctive or other equitable relief") (*citing Struble*, 732 F.2d at 337–38). Although plaintiffs' prayer is for "an order directing and enjoining defendants to pay to the funds all contributions that are due," we are persuaded that under the facts plaintiffs have alleged, the relief they seek is legal and not injunctive.

It is true that not all claims for money must be treated as legal rather than equitable. For example, actions for breach of trust, or disgorgement of ill-gotten gains can be heard in equity. *See Securities and Exch. Com'n v. Com Chemical, etc.* (2d Cir.1978) 574 F.2d 90, 95. Plaintiffs, however, do not seek to enjoin defendants from any course of action,[13] but only to make good on the contributions they have not paid in the past. And, as plaintiffs specifically allege in Count III, failure to make contributions violated the collective agreement between the Union and MGOA. The only equitable remedy included in the relief sought under Count II, then, is an accounting, which would be available as a remedy under Counts I and III. Thus we conclude as a matter of law that such relief is, despite the phrasing of the prayer, a simple claim for breach of contract. Plaintiffs therefore do not have standing under § 502(a)(3) to allege such a claim and defendants' motions to dismiss Count II are granted.[14]

### 2. Count IV

■ For plaintiffs to sustain their claim under § 510 given the facts they assert, they must allege that defendants discharged or harassed a "participant or bene-

ficiary" in order to interfere with the attainment of any rights under the plan, or because they have given information or testified against defendants in any proceeding relating to ERISA or the LMRA. *See West v. Butler*, 621 F.2d 240 (6th Cir.1980) (§ 510's "prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights").

Plaintiffs, according to the complaint, are covered workers and therefore by definition participants in the plans. It is very difficult to think of acts plaintiffs could have alleged that would be more directly intended to interfere with their attainment of rights under a plan—that is, eligibility for welfare or health benefits,[15] and the starting of the clock on eventual vesting in the pension fund. There can have been no conceivable purpose in defendants' activities in discouraging plaintiffs from joining the Union or hiding the Union from them except an intent to interfere with their rights under the plans. We cannot say, therefore, that plaintiffs would be unable to make out a prima facie case of intentional interference with rights protected by § 510. *See Dister v. Continental Group, Inc.* (2d Cir.1988) 859 F.2d 1108, 1111.

■ We are persuaded by Judge Leisure's reasoning in finding that "the exhaustion of administrative remedies is not a prerequisite for maintaining a claim under § 510." *Lawford v. New York Life Ins. Co.* (S.D.N.Y.1990) 739 F.Supp. 906, 912–13 (following *Zipf v. American Tel. and Tel., Co.* (3rd Cir.1986) 799 F.2d 889). As plaintiffs' claim is that defendants acted to hide the plans from them, and to dissuade by illegal means their participation therein, a requirement that they apply to

---

on the employer's part to continue a benefit program—could be arbitrated. *Id.* at 279–280.

**13.** Nor need they, as the 1989 agreement signalled the eventual start of contributions for them and persons similarly situated.

**14.** In so holding we do not reach the issue of whether an injunction to make unpaid contributions to a plan is in fact injunctive relief or damages. *See also Struble,* 732 F.2d at 337–38, *Diduck* 737 F.Supp. at 797–98, n. 5.

**15.** That plaintiffs do not allege any applications to the plan by any of their number or those similarly situated, nor state any particular harm caused by either refusal of the plan to grant them benefits, nor even recount harm caused by their being forced to pay for health or welfare needs that would otherwise be covered by the plan is irrelevant, as it goes to damages and not liability.

the plans for a ruling on their eligibility is almost nonsensical. The prohibited and complained of behavior was defendants' acts for " 'the purpose of interfering with the attainment of any right to which such participant *may* become entitled,' regardless of whether the interference is successful and regardless of whether the participant would actually have received the benefits absent the interference." *Zipf,* 799 F.2d at 893 (emphasis in original). Thus it is irrelevant to the claim whether or not the plans administrator would now declare them eligible. The motions to dismiss Count IV are denied.

## II. *The Motion to Disqualify Plaintiffs' Counsel*

During the period the parties undertook the massive briefing that preceded these motions it became apparent that plaintiffs' counsel, the firm of Kronish, Lieb, Weiner & Hellman, also represents the interests of the Union and the union trustees insofar as they are embroiled in this litigation. Defendants contend that this state of affairs presents plaintiffs' counsel with potential, if not actual, conflicts of interests among its three clients. We agree.

For example, counsel was initially introduced by a union trustee at the first trustees meeting it attended, and was identified as representing the Union. Kronish, Lieb has subsequently responded to defendant's discovery requests on behalf of the Union and at least one union trustee, Eugene Bennett, who is also Secretary–Treasurer of the Union. *See* Kronish letter of December 9, 1991, hereby made part of the record of this case.

Such multiple representation may result in a variety of conflicts among the clients. For example, as we suggested at the summary judgment hearing, plaintiffs may well have claims against the Union for failing to stop defendants' scheme until it had been defrauding them and the Funds for nearly a decade. Tr. at 39–40. And, as defendants argue in their memorandum of law, plaintiffs may well have claims against the union trustees for breach of fiduciary duty

if it transpires that they too improperly failed to act to stop defendants' prohibited acts. Or, with respect to discovery, plaintiffs' counsel may become aware of inculpating facts that pit one of its clients against another. Or defendants may bring an impleader indemnification action against the Union, alleging, for example, that it acquiesced in the plan. While none of these scenarios strike us, at this point in the litigation, as particularly likely, they are nonetheless possibilities worthy of concern.

Canon 5 of the Code of Professional Responsibility directs lawyers to "exercise independent professional judgment on behalf of a client." Ethical considerations 5–1 and 5–14 elaborate on this in a useful way:

> The professional judgment of a lawyer should be exercised ... solely for the benefit of his client and free from compromising influences and loyalties.... [T]he interests of other clients ... should [not] be permitted to dilute his loyalty to his client.

and

> Maintaining the independence of professional judgment required of a lawyer precludes his ... continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.

Canon 9 instructs lawyers to "avoid even the appearance of professional impropriety." We believe that Kronish's multiple representation implicates these canons.

The circumstances of this firm's representation of related clients are strikingly similar to those in *Chateau de Ville Productions v. Tams–Witmark Music* (S.D.N.Y.1979) 474 F.Supp. 223 (Duffy, J.). The court was there faced with a plaintiffs' counsel who represented the parent company of one of the named plaintiffs. That parent had entered into a contract between it and the defendant that created a co-conspirator relationship between them,

even though such was not charged. *Id.* at 225. Judge Duffy observed that "disqualification will be required unless the attorney can show 'that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation.'" *Id.* at 225 (*quoting Cinema 5 Ltd. v. Cinerama* (2d Cir.1976) 528 F.2d 1384, 1387. Taking into account the Second Circuit's "cautious approach to questions of disqualification" because of its potential use as a litigation tool, the court nevertheless disqualified counsel from representing the parent company.[16]

The possibility that plaintiffs may have claims against another of its counsel's clients makes the risk of Kronish, Lieb's continuing to represent all three simply too likely to lead to a conflict of interest, or, as class counsel, an unacceptable appearance of impropriety. However, we recognize that a great deal of work has already gone into the pleadings and discovery already undertaken in this action, and appreciate Kronish, Lieb's intimate knowledge of the facts and law pertaining to plaintiffs' claims and its very competent representation of them thus far. To order plaintiffs to find new counsel at this point in the proceedings would, we believe, greatly prejudice them. Too, Kronish, Lieb prior to this action was not counsel for either the Union or the union trustees but were retained solely to prosecute this action. Levine Aff. at ¶ 3. We therefore follow their request that, in the event of their being disqualified from simultaneously representing plaintiffs, the Union, and the union trustees, they be permitted to continue to represent plaintiffs alone. Such an outcome will not prejudice defendants, and we accordingly grant their motions to disqualify plaintiffs' counsel on those terms.

## CONCLUSION

Mallah's motion to dismiss Count II of the complaint is granted; the remainder of their motion and the nominal defendants'

motion in its entirety are denied. The motions to disqualify Kronish, Lieb from simultaneously representing plaintiffs, the Union, and the Union trustees are granted as specified above. We reserve judgment on the motions for class certification and for joinder of the Union until Kronish, Lieb, plaintiffs, the Union, and the Union trustees have resolved the issue of who will represent whom. Kronish, Lieb is instructed to inform us of such resolution so that oral argument on the remaining motions can be scheduled within two weeks thereafter.

SO ORDERED.

## ON MOTION FOR REARGUMENT

We have before us the Mallah defendants' motion for reargument of our March 5 Opinion and Order denying in large part their motion to dismiss for failure to state a claim, familiarity with which is assumed.

With respect to the Mallah defendants' request to reargue the question of Kronish, Lieb's disqualification, it seems to us that the Mallah defendants misapprehend the nature of the case. According to the allegations of the complaint, which we must accept for present purposes, the various defendants (including the Mallah defendants) were engaged in a massive scheme to deprive a host of garage employees of rights to which they were entitled. Kronish, Lieb was retained by the Union to advise it of what action would be appropriate to afford relief to the persons so deprived (one of their alleged rights being membership in the Union). Contrary to the Mallah defendants' present suggestion, it seems to us that Kronish, Lieb's conduct has been quite consistent with an attempt conscientiously to carry forward the task for which it was retained. The mere fact that they "singl[ed] out large garage operators" (and presumably those with the most readily reachable assets), instead of complicating the lawsuit by naming every possible defendant, hardly seems a just

---

**16.** We are especially concerned because, as was the case in *Chateau de Ville*, plaintiffs' counsel seeks to represent a class. "In a class action, even the appearance of divided loyalties should be avoided." *Id.* at 226 (citation omitted). We are also not convinced that full disclosure and consent as dictated in Disciplinary rule 5-105(C) of the Code of Professional Responsibility is a viable option for a class of at least 470 persons.

**514**

cause for criticism. Nor do we find any merit in any of the Mallah defendants' other suggestions of conflicting interests on the part of Kronish, Lieb.

With respect to *Directors Guild of America, et al., v. Warner Brothers, Inc., et al.* (C.D.Ca.1985) (CV 83–4764–PAR, 83–8311–PAR), which though before us we did not specifically mention, the crux of the court's opinion on the question of disqualification of class counsel for conflicting interests among clients is as follows:

> The [plaintiff and third party defendant] DGA is named as representative of the class composed of women and minority members. At the same time, defendants have filed counterclaims against the DGA which assert that it is wholly or partially responsible for whatever discrimination may exist against women and minorities as a result of its role as bargaining representative and acquiescence in discriminatory practices, if any.

Slip opinion at 7.

No such consideration is here involved.

We also observe that, though our March 5 Opinion does not mention the application for a stay and the request that we dismiss the individual Mallah defendants, we implicitly denied those requests. Accordingly, we modify that Opinion expressly to include our rejection of the Mallah defendants' application for a stay pending the outcome of arbitration unconnected with the lawsuit before us, and its related application that we bifurcate the lawsuit and initially hold a hearing or trial to determine specific limited issues in the case. We further modify the Opinion expressly to conclude that plaintiff's complaint alleges a claim against the individual Mallah defendants and expressly to decline to dismiss them from the action at this point. *See* Compl. at ¶ 164(b) and (c).

Concluding that we have overlooked no controlling principle of law nor any material matter of fact, the motion is in all respects denied.

SO ORDERED.